739 So.2d 688 (1999)
Santiago ESCUDERO, Appellant,
v.
Gloria ESCUDERO, Appellee.
No. 98-1833.
District Court of Appeal of Florida, Fifth District.
September 3, 1999.
*689 Gary R. Dorst of Gary R. Dorst, P.A., Maitland, for Appellant.
Gina R. Perez-Calhoun, The Center for Professional Legal Services, Orlando, for Appellee.
W. SHARP, J.
The former husband, Santiago Escudero, appeals from a final judgment dissolving his marriage to Gloria Escudero. He argues on appeal that he should have been granted a special equity in the marital *690 home, that the trial court erred in awarding the marital home to the former wife, and that it erred in awarding the former wife permanent alimony. This is a most unusual case. For the reasons given below, we affirm.
Some of the facts and circumstances in this case were not in dispute. Others were so bitterly contested the trial judge had to conclude that one party was making extremely false accusations, and was being deceptive and untruthful. The trial judge found that party was Santiago.
This was the second marriage for these parties. They were first married in 1955 and divorced in 1978, in New Jersey. Three children were born to them, and they, together with Gloria's daughter by a prior marriage, were raised in the parties' home during that time. After the first divorce, the parties lived together off and on.
Santiago experienced three heart attacks in 1985. He also had surgery for lung cancer in 1988. At the time of the dissolution in 1998, he was no longer being treated for cancer, although he was seeing doctors to treat his heart condition. While Santiago was recuperating in the hospital in 1988, he and Gloria decided to remarry. Their plan was to move from New Jersey to Florida, and to purchase a home with $50,000 from a settlement Santiago had received when he retired from his work as a longshoreman.
At the time of the dissolution, Santiago was retired. His financial affidavit and testimony established he received social security disability and a pension, in the amount of $1,721 per month. He testified he had no other income or resources other than the marital home, which he valued at $100,000, subject to a $37,000 mortgage. He testified he owned a new car, which was fully paid for by himself and his insurance company when a prior vehicle was totaled in an accident. He denied he had or ever used credit cards, although his financial statement disclosed a credit card debt of $2,700. He disclosed no bank accounts or deposits of any kind.
He also claimed that Gloria had given him a "bad life." He had to do everything at homecook, clean the pool, cut the grass, wash the dishes. He said Gloria spent her time playing Bingo and gambling. She kept all the money she earned from her job as a clerk in a hospital and her retirement income to herself, and spent it only on herself. He claimed she was violent, abusive and had turned his children against him. He testified she had found out he had a secret bank account (totaling some $26,000) in New Jersey in the joint names of himself and his youngest daughter, Yvonne, and that Gloria had instigated and manipulated Yvonne to take the funds and absconded with them while he was recuperating in Spain in 1989, after the parties remarried. Everything in this paragraph was refuted by subsequent testimony, and the trial judge clearly rejected his credibility.
The record further established that at the time of the dissolution, Gloria had retired from her clerking job. She was 68 years old. Her only income was from social security and a pension totaling $998 per month. She was under psychiatric care for depression caused by the abusive treatment she endured during the marriage. In 1993 she purchased (on credit) a new car, to replace an older car which had ceased to run. She must pay $270 per month towards the car. Her financial affidavit, which the trial judge said he accepted as "true," shows no bank accounts or liquid assets of any kind.
She also has an extremely high credit card debt$10,601.72 (not counting the car). She testified that most of the credit card debt arose from the necessity to furnish, fix-up and improve the marital home, and pay living expenses. Other than making the mortgage payments, she testified Santiago refused to pay any of the parties' living expenses or purchases. She was only able to make ends meet by paying by credit cards, borrowing money from her *691 cousin, Maria Rosado, and receiving funds her children sent her from time-to-time. Her cousin testified that she often accompanied Gloria on shopping trips to purchase furnishings for the house and that Gloria always paid for the purchases with her credit cards, even though sometimes Santiago accompanied them.
Three adult children testified. Linda Celiano, Gloria's daughter by a prior marriage, testified she lived in Santiago's household from the time she was three years old until she was nineteen. Santiago was extremely abusive and violent. Police were called to the house many times. There were continual beatings while he was in the home and verbal and emotional abuse. She was extremely intimidated by him. Although she witnessed the abuse during the parties' first marriage, she thought the pattern continued in the second.
Yvonne Escudero, the parties' daughter, testified her father was very abusive to her motherarguing, yelling, fighting, physically hitting her, throwing things at her. Police were called to the house too many times to count. She ceased to live with them when they moved to Florida, but she thought the abuse continued.
Yvonne denied her mother turned her against her father. His own behavior had done that. She also testified her mother had nothing to do with the bank account in New Jersey. Her mother had known nothing about it until Yvonne later told her. In 1988, while Santiago was in the hospital, he told Yvonne about having a $50,000 account in a New Jersey bank in their joint names. He told Yvonne to take $25,000 out for "forgiveness, for things he had done when she was growing up." It was a kind of atonement.[1] Yvonne testified she left $27,000 in the account, and had no idea what had become of it. No such asset was disclosed on Santiago's financial statement.
George Escudero, a son of the parties, testified that while he was growing up in the parties' household, their relationship was bad. His father was very cruel to his mother and to all of them. There were times when his father beat his mother up in front of him. Santiago tried once to throw Gloria out of a window. The police were called to the house many times.
George maintained contact with Gloria since the parties moved to Florida. He thought the abusive pattern of the marriage had continued. One time when he was speaking with his mother on the telephone while she was in Florida, he overheard his father screaming, cursing and threatening her. She told him she had locked herself in the bathroom and he advised her to call 911. Santiago admitted that while the parties were living together in Florida he had been arrested and convicted of spouse abuse. He said he pled guilty because he wanted to go to jail.
George also testified that while he was growing up in the parties' household, Santiago refused to contribute any funds to support the family. His mother had to pay the rent, utilities, groceries and tuition for the children. She worked overtime and held second part-time jobs. She was unable to save any money for herself. George was forced to take a job at age sixteen to help feed the family. He said he had no idea what his father had done with his earnings. He had made a lot of money as a longshoreman. George knew his father had sent a lot of money to Spain to cousins and brothers.
Gloria testified that during the first marriage, she had been required to pay the rent and support the family from her earnings. Santiago had told her he would save his money and then he would buy a house. During the second marriage, Santiago paid the mortgage but she had to pay all the rest of their living expenses and, in addition, $300 per month to Santiago as rent.

*692 I. Special Equity
The testimony was not in dispute. After the parties remarried, the $50,000 used to purchase the residence in Florida came from Santiago's funds. He testified its source was a workers' compensation settlement. However, he placed the title to the house in the parties' joint names, thereby creating a presumption of a gift to Gloria. See § 61.075(5)(a)5.; Robertson v. Robertson, 593 So.2d 491 (Fla.1991); Swickle v. Swickle, 723 So.2d 310 (Fla. 4th DCA 1998); Archer v. Archer, 712 So.2d 1198, 1199 (Fla. 5th DCA 1998). The only testimony as to why he placed the title in joint names follows:
Because I felt bad. I'm an old man and I can die at any time. But I feel very sorry because she has a son that's abandoned and she had three of them that are very close.
At that point in time, Santiago had just undergone surgery for lung cancer and his concern about his own mortality was valid. He also denied he intended to make a gift of the property to Gloria.
Although the court could have found a special equity existed here, it could also have denied such a finding, as it did. The court did not have to believe Santiago's testimony, even if unrebutted. Dept. of Highway Safety v. Dean, 662 So.2d 371 (Fla. 5th DCA 1995). Santiago's credibility was clearly challenged in this proceeding and he had the burden of establishing a special equity.[2]

II. Equitable Distribution.
The trial court awarded no marital assets to the former husband. It awarded the marital home ($63,000 equity) and all the personal property in the house ($4,000 plus the considerable debt related to it) to the former wife. This distribution is contrary to the statutory presumption.[3] Absent extraordinary circumstances, distribution of the marital assets should be equal to both of the parties.[4] The trial court should make fact findings to justify an inequitable award.[5]
At the conclusion of the case, the trial court justified the award by finding that the former husband had concealed his assets (earnings and income) during the first marriage and the second as well, by not contributing to the family and joint living expenses of the parties other than to pay the $400 mortgage payment. He also made additional findings that Santiago's pattern of abusive behavior during the first marriage was intolerable, and it had continued during the parties' second marriage. There was sufficient evidence to support these findings.
Santiago argues that the unequal award cannot be justified by the court's findings of misconduct during the first or the second marriage. We agree that Santiago's abusive misconduct during the first marriage of the parties cannot serve as a basis for rulings in this case, although it is relevant to establish a pattern of behavior which the court found continued for the parties' second nine-year marriage. We agree that unless misconduct of a party results in dissipation of marital assets, it does not justify an unequal award of marital assets. See Noah v. Noah, 491 So.2d 1124 (Fla.1986); Horne v. Horne, 711 So.2d 1310 (Fla. 1st DCA 1998); Childers v. Childers, 640 So.2d 108 (Fla. 4th DCA 1994); Murray v. Murray, 636 So.2d 536 (Fla. 1st DCA 1994); Heilman v. Heilman, 610 So.2d 60 (Fla. 3d DCA 1992). *693 This includes a spouse's criminal behavior, Murray; and abuse, Bell v. Bell, 587 So.2d 642 (Fla. 1st DCA 1991). See also Noah, 491 So.2d at 1127 (only adultery is a proper factor to be considered in awarding alimony).
However, concealment and dissipation of marital assets are behaviors which justify disproportionate awards of marital assets.[6] The trial judge found that aside from contributing $400 per month to pay the mortgage on the parties' residence, Santiago concealed the balance of his income during the second marriage. Assuming he received $1,500 per month after retirement[7] while the parties lived together in Florida for seven years, and he contributed only $400 per month for the mortgage but concealed the balance (as the trial judge found) that would add up to $1,100 per month, for seven years, or a total of $92,000 which was not accounted for.
The trial court also stated at the end of the trial that it found the former husband had concealed marital assets (earnings) during the first marriage and that pattern of behavior had also continued during the second marriage.[8]
This is an extraordinary case with findings based primarily on the trial court's resolution of questions of fact and the parties' credibility. Under these circumstances, we must affirm the equitable distribution award.

III. Permanent Alimony.
Santiago argues that permanent alimony is not appropriate because this was a short-term marriagenine years. Segall v. Segall, 708 So.2d 983 (Fla. 4th DCA 1998). Although it is debatable whether or not the presumption against permanent alimony should be applied to parties who marry, divorce and remarry, even so, a nine-year marriage falls into the "gray" area.[9] There is no presumption for or against permanent alimony. Zeigler v. Zeigler, 635 So.2d 50 (Fla. 1st DCA 1994). Awards of permanent alimony in these cases should be based on a review of the factors set forth in the statute.[10]
In this case, the trial judge awarded the former wife $350 per month permanent alimony. He said the award was based on the disparity in the parties' respective incomes ($723 per month, as Santiago was receiving $1,721 per month, and Gloria was receiving $998 per month). He further based the award on the parties' "contributions to the marriage"a possible reference to his finding that Gloria had over-contributed her earnings to the family and parties' living expenses. He referenced the nine-year marriage, and the fact that there had been an abusive relationship during the second marriage (as well as the first). The relevance of this finding may relate to the former wife's testimony that she has had to seek psychological counseling and help for depression, which *694 was related to the abuse she endured during the parties' marriage.
Finally, the trial judge made a finding that the former wife needs additional support and the former husband has the ability to pay $350 per month towards her needs. At the conclusion of the trial, the judge stated he accepted as factually accurate the former wife's financial affidavit. He was concerned that she would be unable to make her car payment, pay the mortgage, meet her credit card debt and get by on her retirement income. The figures show that she could not make it without help from her adult children, or alimony from her former husband. The trial judge's alimony award in this case was within his discretion. Canakaris v. Canakaris, 382 So.2d 1197 (Fla.1980).
AFFIRMED.
DAUKSCH and COBB, JJ., concur.
NOTES
[1] At the trial, Gloria was obviously shaken by this testimony and wanted to know what Santiago had done to Yvonne. The court would not let Yvonne answer.
[2] Baird v. Baird, 696 So.2d 844, 847 (Fla. 2d DCA 1997).
[3] Section 61.075(1) provides that a 50-50 distribution is to be made.
[4] § 61.075(1), Fla. Stat. (1997); Robertson v. Robertson, 593 So.2d 491, 493 (Fla.1991); Herrera v. Herrera, 673 So.2d 143 (Fla. 5th DCA 1996).
[5] § 61.075(1) and (3), Fla. Stat. (1997); Reyes v. Reyes, 714 So.2d 646, 647 (Fla. 4th DCA 1998); Lawrence v. Lawrence, 709 So.2d 192 (Fla. 3d DCA 1998); Herrera v. Herrera, 673 So.2d 143 (Fla. 5th DCA 1996).
[6] § 61.075(1)(i); Beers v. Beers, 724 So.2d 109 (Fla. 5th DCA 1998); Murray v. Murray, 636 So.2d 536, 538 (Fla. 1st DCA 1994); Adams v. Adams, 677 So.2d 6 (Fla. 5th DCA 1996).
[7] The current figure was $1,721.
[8] In this regard, the trial judge said:

That the husband did everything to conceal his assets by not paying the household expenses in the earlier marriage, and by paying the mortgage in the second marriage but the wife paying the other expenses. And that based on his conduct in the second marriage, the old saying of you reap what you sow is appropriate here.
[9] See Nelson v. Nelson, 721 So.2d 388 (Fla. 4th DCA 1998) (12½ year marriage); Segall v. Segall, 708 So.2d 983 (Fla. 4th DCA 1998) (8 year marriage); Young v. Young, 677 So.2d 1301 (Fla. 5th DCA 1996) (15 year marriage); Gregoire v. Gregoire, 615 So.2d 694 (Fla. 2d DCA 1992) (11 year marriage). This court has held that a six year marriage also falls into the gray area. Pollock v. Pollock, 722 So.2d 283 (Fla. 5th DCA 1998). But see, Green v. Green, 672 So.2d 49 (Fla. 4th DCA 1996) (6 year marriage is a short-term marriage).
[10] § 61.08, Fla. Stat.