906 So.2d 1250 (2005)
Iris YITZHARI, Appellant,
v.
Eli YITZHARI, Appellee.
No. 3D04-337.
District Court of Appeal of Florida, Third District.
July 27, 2005.
*1251 Scott Margules; Greene, Smith & Associates and Cynthia L. Greene, Miami, for appellant.
Kluger, Peretz, Kaplan & Berlin and Jason R. Marks, Miami, for appellee.
Before WELLS, SHEPHERD, and CORTIÑAS, JJ.
WELLS, Judge.
Iris Yitzhari appeals from a Final Judgment of Dissolution of Marriage, complaining that the judgment is both contrary to the law and an abuse of discretion in many of its determinations. The wife also claims entitlement to a new trial because the inordinate delay (thirteen months) in issuing *1252 the final judgment, coupled with the substantial inconsistencies and deficiencies in the judgment, indicate that something is seriously amiss on the merits. For the following reasons, we agree with the wife and remand for a new trial.
This was a nine-year marriage between two Israeli citizens.[1] The wife was twenty-years-old at the time of the marriage and had just completed two years service in the Israeli military. The husband, a businessman almost twenty years her senior, owned a number of rental properties and also owned and operated an electronics store in New York City throughout the marriage.
Four children were born of this nine-year marriage: Kelly, David, Ben, and Daniel, aged ten, seven, six, and four respectively, at the time the petition for dissolution was filed. The wife was a stay-at-home mother during the marriage.
The parties enjoyed a very comfortable lifestyle throughout the marriage, living in a beautifully appointed residence comprised of three apartment units in the heart of New York City. The children attended expensive private schools; the parties employed at least two, and often three, housekeepers at all times; and they traveled extensively to Israel, Belgium, Holland, Turkey, Greece and Florida.
In 2000, the parties relocated to Miami and contracted for the construction of a five-bedroom home in Aventura. While waiting for the home to be built, they lived in a two-bedroom condominium unit titled in the names of the husband and his uncle. In February 2001, the wife filed for a divorce. The husband counter-petitioned seeking custody of the children, claiming, among other things, that the wife was unfit. He also asked the court to make the wife and his children vacate the condominium unit in which they were living, claiming that his uncle was no longer willing to lease to the wife since the husband was no longer living there.
Although the wife sought and was awarded temporary child support (approximately $3200 per month) and alimony (approximately $3500 per month), the husband consistently refused to pay the alimony portion of the award. By June 2001, the wife, with four children and herself to support, wrote to the husband asking him for the money that he owed her from February through May, telling him that she and the children could not survive on only $3000. In desperation, she threatened to turn him over to the Internal Revenue Service for income tax evasion. He responded by filing a "SUGGESTION OF EXTORTION," in which he claimed that the wife's threats "placed a well-founded fear in [him] that [the wife] will do something which would place [the husband] and the parties [sic] minor children's physical well-being in jeopardy."
By August 2001, the wife was "at her wits end" as to how she was going to care for her children. She again petitioned the court for funds seeking an increase in child support so that the children could attend private school as they had in the past. Stating that she had been notified by the husband's uncle that he could terminate her tenancy in thirty days, and that she was "in desperate need of additional monies to help her maintain the children during the school year," the wife offered "to turn over custody to their father." As she testified at trial, the only way she could assure that her children would not be living in the street was to give them to their father.
By the time the wife's motions regarding support and temporary fees and costs were heard in October 2001 (after being *1253 delayed by the husband's objections to orders referring these matters to the general master), the wife had already been notified by an attorney for the husband's uncle that she had less than a month to vacate the condominium where she and the children were living. With insufficient money and no place to live with four children, the wife ceded custody of the children to their father, who promptly returned to New York, placed the children in private schools, and then took them to Israel. He also served notice on the wife, an Israeli with limited language and no work skills, that he would "not be paying any alimony to the wife next month and only a partial amount the following month"; that he would be "immediately filing a motion for temporary support"; and that if she had not already done so "she had better go out and get a job," because if she did not get a job or pay, he would "move for contempt and request all sanctions available at law, including incarceration until such time as she purges herself of contempt." The wife was evicted. Although the contents of the condominium concededly were marital assets, the husband demanded that the wife not remove "so much as a fork."
On October 12, 2001, approximately nine months after this action was filed, and after the wife had ceded custody of her children, temporary attorneys' fees and costs were finally awarded to the wife. The husband paid the award with funds returned to the parties upon cancellation of the contract for construction of their new home in Aventura, funds which in part belonged to the wife.
On January 4, 2002, the husband was ordered to pay $1500 a month to the wife for temporary support. He made those payments only through May 2002. This matter was tried over a three day period in July 2002. At the end of the trial, the judge stated that she would either issue a written order or hold a hearing and announce a judgment. She did neither. For the next thirteen months nothing happened largely because the judge who conducted the trial was suspended. Finally, on August 26, 2003, a final judgment of dissolution of marriage was entered. That judgment, in pertinent part, identified seven parcels of real property titled partially or wholly in the husband's name, all but one of which were acquired before the marriage. The value of these properties, including the property acquired after marriage, was determined to be over one million dollars, all of which  including the enhanced value during the marriage  was awarded to the husband.
The husband was awarded custody of all four children. Based on representations made at the final hearing that he intended to reside with them in New York City, the husband was awarded exclusive use and possession of the marital residence in New York City (valued at over a million dollars) until the youngest child attained majority, that is, until twelve years after the marriage was dissolved. The wife was awarded no assets other than her interest in the marital home which was going to be occupied by the husband and the children for the next twelve years.
The wife, a high school graduate who spoke English poorly and had no Spanish skills or work experience, was awarded "bridge the gap" alimony in the amount of $3466 per month for six months. The judgment was silent on the temporary alimony that the husband had failed to pay for well over a year.
The wife claims here that this judgment is so seriously flawed that reversal and a new trial are mandated. For a number of reasons, we agree. First, despite the husband's testimony which confirmed that during the marriage he expended both marital funds and labor to manage, maintain and improve seven properties titled *1254 wholly or partially in his name, the trial court refused to award any portion of value of these properties (valued at over one million dollars) to the wife because she failed "to carry her burden" of proving when, and how much, marital funds were expended.
By definition, "[t]he enhancement in value and appreciation of nonmarital assets resulting either from the efforts of either party during the marriage or from the contribution to or expenditure thereon of marital funds or other forms of marital assets, or both," is a marital asset subject to equitable distribution. § 61.075(5)(a)2, Fla. Stat. (2003)(emphasis added); see Robbie v. Robbie, 654 So.2d 616, 617 (Fla. 4th DCA 1995)(holding that even carrying out the decisions of others relating to a nonmarital asset may constitute marital labor requiring equitable distribution of the enhanced value of the asset); see also Miceli v. Miceli, 533 So.2d 1171, 1172 (Fla. 2d DCA 1988)(a pre-equitable distribution statute case finding that "the enhanced value of separately owned assets becomes a marital asset when that enhanced value is due to marital labor or funds"). Based on the husband's testimony that he alone managed one of these properties; that he used marital funds to maintain and upkeep at least two of them; and that he maintained and, in some instances, made improvements to the rest of the properties, the wife was entitled to distribution of the enhanced value of these assets.[2]See § 61.075(1), Fla. Stat. (2003)(mandating equitable distribution of marital assets).
Once it was established that marital labor or funds were used to improve these assets, the burden then shifted to the husband to show that some, if any, portion of the enhanced value was exempt from equitable distribution. Gaetani-Slade v. Slade, 852 So.2d 343, 347 (Fla. 1st DCA 2003)(stating that "once a non-owner spouse establishes that marital labor or funds were used to improve [an asset] that was nonmarital, the owner-spouse has the burden to show which parts [of the enhanced value] are exempt")(emphasis added)(citing Adkins v. Adkins, 650 So.2d 61, 68 (Fla. 3d DCA 1994)(on rehearing)); O'Neill v. O'Neill, 868 So.2d 3, 5 (Fla. 4th DCA 2004)(stating that "once it is established that marital labor was used, the burden falls to the party claiming that the increase is nonmarital to establish whether any part of the increase was the result of passive market conditions and, thus, is exempt from equitable distribution"); Young v. Young, 606 So.2d 1267, 1270 (Fla. 1st DCA 1992)(confirming that a trial court cannot refuse to distribute the appreciated value of a nonmarital asset improved by marital labor or funds "because the [non-owner spouse] ha[s] not established how much the improvements enhanced the value of the property," and that the burden is on the owner spouse to prove whether any part of the enhanced value is exempt from distribution). The trial court, therefore, clearly erred when it concluded that the wife was entitled to no equitable distribution of any of these assets because she had failed to pin-point the dates and times of the parties' contributions of labor or funds to these assets. It was the husband's burden to show what portion, if any, of the enhanced value was exempt from distribution.
Second, the trial court abused its discretion by awarding only six months bridge-the-gap alimony to an unemployed spouse who had only a high school education; *1255 who had been a stay-at-home mother for nine years; who had poor English and no Spanish language skills; who received no distribution of assets that would produce income; and who had absolutely no other source of income. Bridge-the-gap alimony serves to assist a spouse already capable of self-support during the transition from being married to being single. See, e.g., Borchard v. Borchard, 730 So.2d 748, 753 (Fla. 2d DCA 1999)(confirming that bridge-the-gap alimony is given to "assist a spouse with any legitimate, identifiable, short-term need"); Iribar v. Iribar, 510 So.2d 1023, 1024 (Fla. 3d DCA 1987)(confirming that bridge-the-gap alimony is appropriately awarded where a spouse "is presently employed, has more than adequate employment skills, and needs nothing to be `rehabilitated' to, other than to ease [the] transition from a married to a single status"); see also Weintraub v. Weintraub, 864 So.2d 22, 24 (Fla. 2d DCA 2003)(confirming the propriety of bridge-the-gap alimony where a spouse had an advanced specialty degree, had worked in that specialty field, and only needed assistance to prepare to reenter the field); Barner v. Barner, 716 So.2d 795, 799 (Fla. 4th DCA 1998)(concluding that, although the wife was capable of self-support, bridge-the-gap alimony was appropriate because income producing property would provide no liquidity in the short term). As we recently confirmed in Williams v. Williams, 904 So.2d 488 (Fla. 3d DCA 2005), bridge-the-gap alimony is wholly inappropriate in circumstances such as those existing here:
In the instant case, the trial court's findings of fact, which we conclude are supported by competent substantial evidence, indicate that the former wife currently lacks the education, training, or skills to support herself. The former wife does not possess even a high school education, has no special skills or training, and was earning $6.50 an hour working at Publix when she gave birth to the parties' first child in 1992, at which point she terminated her employment and did not return to the work force until after the parties separated. Clearly, based upon the evidence presented and the trial court's finding that the former wife "has [a] limited ability to presently support herself without financial assistance from her Husband," the trial court abused its discretion by awarding bridge-the-gap alimony. The former wife, at this time, does not possess adequate employment skills and clearly needs to be trained or rehabilitated. Accordingly, the award of bridge-the-gap alimony is reversed.
Id. at 491.
We also cannot agree that consideration of rehabilitative alimony was inappropriate because the wife failed to submit "a proper plan for rehabilitation," as the judgment states. Rather, the wife testified that she enrolled in, and wanted to complete, a two-year English program at Barry University to prepare for the TEFL (Test of English as a Foreign Language), but that she had to drop out because she had no money to continue. She also testified that after she had become proficient in English she wanted to attend school to become computer literate so that she could get a job. The record also confirms that the wife provided the husband's attorney with a written rehabilitative plan that estimated the costs of attending Barry University plus living expenses. It is unclear whether the trial court ever reviewed the written plan or whether the written plan was ever introduced into evidence. In any event, a written rehabilitative plan was not essential because the wife's testimony was sufficient. See Layeni v. Layeni, 843 So.2d 295, 299 (Fla. 5th DCA 2003)("[a]n award of rehabilitative alimony should not turn on whether the rehabilitative plan is *1256 oral or written. Instead, such an award must be based on whether an adequate and credible rehabilitative plan is presented to the court, assuming that the requesting party also demonstrates his or her need and the other party's ability to pay").
The trial court also incorrectly concluded that, based on the length of this marriage, consideration of permanent alimony was inappropriate. A nine-year marriage has been held to fall into the "gray area" in which "[t]here is no presumption for or against permanent alimony." Escudero v. Escudero, 739 So.2d 688, 693 (Fla. 5th DCA 1999); see also Bracero v. Bracero, 849 So.2d 388, 390 (Fla. 5th DCA 2003)(same); Adinolfe v. Adinolfe, 718 So.2d 369, 370 (Fla. 4th DCA 1998)(finding that "nine years [of marriage] is not such a short period as to deny this wife permanent periodic alimony as a matter of law"). As a gray area marriage, disparate earning capacity becomes a significant factor in deciding whether permanent or temporary alimony is appropriate, a factor not considered below. See Nelson v. Nelson, 721 So.2d 388, 389 (Fla. 4th DCA 1998)(in gray area marriages, "a disparate earning capacity becomes a `significant factor' in deciding whether permanent or temporary support is appropriate"); Burrill v. Burrill, 701 So.2d 354, 356 (Fla. 1st DCA 1997)(confirming that disparity in earning ability supported a permanent periodic award to a wife even though she was only months away from earning a college degree); Young v. Young, 677 So.2d 1301, 1306 (Fla. 5th DCA 1996)(concluding that the trial court erred in refusing to consider a permanent alimony award to an engineer following a gray area marriage to a medical doctor, in significant part, based on income disparity). On remand, the trial court must, therefore, consider whether either a rehabilitative or a permanent alimony award would be appropriate.
Third, the trial court abused its discretion by awarding exclusive use and possession of the marital residence to a husband and children who were not residing in the marital residence either at the time of the final hearing or thirteen months later when judgment was finally entered. Without question, use and possession of a marital home may properly be awarded to a custodial parent "as an incident of the other party's support obligation." E.g., McDonald v. McDonald, 368 So.2d 1283, 1284 (Fla.1979). However, awarding exclusive use and possession of an apartment that is being rented to a third party for $8500 a month rather than being occupied by the children, cannot be viewed as an incident of child support. This is especially so where, as here, the parties' respective financial positions make it clear that no support award from the non-custodial parent is justified. In fact, the court below refused to order the wife to pay child support because she had no income.
More to the point in this case, it was incumbent on the court below to "ensure that neither spouse passe[d] automatically from misfortune to prosperity or from prosperity to misfortune, and, in viewing the totality of the circumstances, one spouse [was not] `shortchanged.'" Canakaris v. Canakaris, 382 So.2d 1197, 1204 (Fla.1980). Awarding exclusive use and possession to the husband in this case deprived the wife of any benefit for a period of twelve years from the sole asset that she received. This award to the husband, combined with only six months bridge-the-gap alimony to an unemployed and unemployable spouse, guaranteed the wife's permanent passage from prosperity to homelessness and constitutes a clear cut abuse of discretion.
There are, unfortunately, additional and substantial deficiencies in the final judgment, including, but certainly not *1257 limited to, the failure to reduce the husband's undisputed temporary alimony arrearage to judgment and the award of a special equity in the marital residence to the husband. We need not address these issues individually here because our reversal of the above awards mandates reconsideration of all issues relating to property division and support. Moreover, we also order a new trial because the inconsistencies and deficiencies in the judgment make it clear that at the time judgment was entered some thirteen months after the final hearing, the trial judge did not recall the evidence.[3]See Ascontec Consulting, Inc. v. Young, 714 So.2d 585, 587 (Fla. 3d DCA 1998)(while a substantial delay alone does not necessarily justify a new trial, reversal and remand for a new trial is appropriate where there is "a combination of delay plus an indication that something is seriously amiss on the merits"); see also Reis v. Reis, 739 So.2d 704, 705 (Fla. 3d DCA 1999)(same); Donn v. Donn, 733 So.2d 581, 583 (Fla. 4th DCA 1999)(reversing for a new trial after a ten-month delay because there were numerous inconsistencies between the terms of the final judgment and the facts presented at the final hearing, and because the trial judge failed to make pertinent findings regarding alimony); City of Miami v. Tarafa Constr., Inc., 696 So.2d 1275, 1278 (Fla. 3d DCA 1997)(reversing and remanding for a new trial where a final judgment, entered nearly seven months after close of all the evidence, was found to be "somewhat confusing, and in some cases contradictory"); McKenzie v. McKenzie, 672 So.2d 48, 49 (Fla. 1st DCA 1996)(reversing a judgment entered a year after the final hearing and remanding for a new trial because "[i]nconsistencies in the final judgment suggest that the trial judge may not have recalled the evidence presented at the hearing"); Tunnage v. Bostic, 641 So.2d 499, 500 (Fla. 4th DCA 1994)(reversing and remanding for a new trial where a seven month delay was involved because, "due to the confusing nature of the final judgment, it cannot be determined with certainty whether the final judgment reflected the evidence or whether the trial court recalled the testimony of witnesses or the dynamics of the trial"); cf. Duva v. Duva, 674 So.2d 774, 776 (Fla. 5th DCA 1996)(concluding that reversal was not warranted where inconsistencies in the final judgment were insubstantial, and where the parties had appeared before the court a number of times in the ten-month period following trial, during which time the court had made comments on the record indicating continued familiarity with the case).
Accordingly, we reverse and remand for a new trial on all issues[4] and instruct the *1258 trial court to expeditiously enter a temporary fee and cost award in favor of the wife, so that she may obtain counsel comparable to counsel representing the husband.
NOTES
[1] The husband is also a United States citizen.
[2] The testimony was that at least one of the properties was acquired after the marriage and, thus, by definition was a marital asset subject to distribution. See § 61.075(5)(a), Fla. Stat. (2003)(defining marital assets as including "[a]ssets acquired . . . during the marriage, individually by either spouse or jointly by them").
[3] The trial transcript was not available to the trial court at the time judgment was entered and comments made by the trial judge regarding the parties' purported failure to provide her with proposed judgments confirms that, among other things, she did not recall that she had advised the parties that she would either issue her own judgment or call them together for an oral ruling.
[4] This would include, if appropriate, consideration of issues relating to custody. E.g., Feliciano v. Feliciano, 674 So.2d 937 (Fla. 4th DCA 1996)(confirming that a trial court is not bound by an agreement regarding child support, custody, and visitation where it determines that it is not in the best interests of the children); Jones v. Jones, 674 So.2d 770, 774 (Fla. 5th DCA 1996)(stating that the "best interests of the children are to govern the custody decision, regardless of any stipulation between the parties"). As our sister court recently stated: "[i]t is incumbent upon the trial court to ensure that any purported agreement or arrangement between a child's parents does not shortchange the child's interests. `It is undisputed, and should be indisputable, that a trial court's responsibility to the child cannot be abdicated to any parent, any expert. That heavy responsibility mandates that a court is not bound by any agreement between parents.'" Dorsett v. Dorsett, 902 So.2d 947 (Fla. 4th DCA 2005)(quoting Lane v. Lane, 599 So.2d 218, 219 (Fla. 4th DCA 1992)). We do not, therefore, preclude consideration of matters relating to the parties' agreement or custody issues, if appropriate, on remand.