WALLACE, Judge.
 

 Christopher H. Abdnour (the Husband) appeals the final judgment that dissolved his seven-year marriage to Amy L. Abdn-our (the Wife).
 
 [1]
 
 The Husband raises three issues for our review. First, he challenges the trial court’s classification of certain assets as marital and the valuation and equitable distribution of the marital assets. Second, the Husband contests the trial court’s award to the Wife of “bridge-the-gap” alimony. Third, the Husband challenges the trial court’s award to the Wife of temporary alimony and temporary attorney’s fees. The Wife cross-appeals, arguing that the trial court erred in failing to impose a constructive trust in her favor on the Husband’s home.
 

 We affirm without comment the awards of bridge-the-gap alimony, temporary alimony, and temporary attorney’s fees. We also affirm without comment the trial court’s refusal to impose a constructive trust on the Husband’s home. However, because the trial court erred in its classification of some of the contested assets as marital and in its valuation of the parties’ assets, we reverse the final judgment in several respects and remand for the entry of an amended final judgment.
 

 I. A PRELIMINARY NOTE
 

 Neither the Husband nor the Wife had amassed substantial wealth. Nevertheless, the nature of their assets — combined with several transactions made before the parties separated — presented the trial court with a number of complex issues relative to the determination of the non-
 
 *359
 
 marital portion of several assets and the valuation of the parties’ marital property. Despite the obvious complexity of the financial issues in the case, neither of the parties presented the trial court with the testimony of a forensic accountant or other appropriate experts.
 
 [2]
 
 Instead, the parties themselves were the only witnesses to testify at the trial. Their testimony was often inadequate to fully elucidate the difficult financial issues facing the trial court.
 
 [3]
 

 Fortunately, the voluminous documentary evidence in the record provides us with sufficient information to review the financial aspects of the final judgment. After a thorough review of the record, we are compelled to reverse the financial aspects of the final judgment in several respects. Nevertheless, we commend the trial judge for the patience she displayed and the effort she devoted to analyzing the many financial issues in this case, including the ones that we will now examine.
 

 II. DISCUSSION
 

 A. The Husband’s Annual Leave and Sick Leave
 

 The Husband is a civilian employee of the Department of Defense under the Federal Employee Retirement System (FERS).
 
 [4]
 
 The trial court found that the Husband had accumulated 1482 hours of annual leave through his employment during the marriage and that all but 284 hours of that leave had been used as of the date of separation. The trial court combined the remaining 234 hours of annual leave with the Husband’s accumulated sick leave of 1333 hours and determined that the value of the total accumulated annual and sick leave of 1567 hours was a marital asset subject to equitable distribution. The trial court determined that the combined value of the accumulated annual and sick leave was $61,358.05 and divided that amount equally between the parties. This was error.
 
 [5]
 

 (1) Annual Leave
 

 The Husband entered the marriage with approximately 240 hours of accumulated annual leave. Annual leave accrued during the marriage was either used when earned or was lost,
 
 [6]
 
 leaving the Husband with 234 hours of accumulated annual leave at the time of the parties’ separation. Because the accumulated annual leave
 
 *360
 
 does not exceed the number of hours the Husband had at the beginning of the marriage, these annual leave hours are not a marital asset subject to equitable distribution.
 
 See Everette v. Everette,
 
 620 So.2d 1115, 1115-16 (Fla. 5th DCA 1993).
 
 [7]
 
 On remand, the trial court shall set aside the accumulated annual leave as the Husband’s nonmarital property.
 

 (2) Sick Leave
 

 Sick leave hours may be accumulated throughout a federal civil service worker’s career and may be used at any time the employee must be absent from work for health reasons. However, there is no provision under the FERS system for payment of the cash value of unused sick leave to retiring civil servants.
 
 See
 
 5 C.F.R. § 842.301 (2006).
 
 [8]
 
 It follows that sick leave hours accumulated under FERS are not a marital asset subject to distribution.
 

 The trial court’s handling of the sick leave results in a final judgment requiring an act impossible to perform and must therefore be reversed.
 
 See Selby v. McQuillan,
 
 59 Neb. 158, 80 N.W. 504, 505 (1899) (“But the law does not require vain things.... It does not command the performance of that which, in the very nature of things, it is impossible to perform.”). Even if the judgment should stand, a future action for contempt would necessarily fail for the same reason.
 
 See Phillips v. Phillips,
 
 588 So.2d 9, 10 (Fla. 2d DCA 1991) (“Civil contempt is utilized to obtain compliance with a court order and may only be used when the contemnor has the ability to comply.”). On remand, the trial court shall enter an amended final judgment providing that the sick leave is not a marital asset subject to equitable distribution.
 

 B. The Husband’s Thrift Savings Plan
 

 As an FERS member, the Husband participated in the federal Thrift Savings Plan (TSP) before the marriage and continued to do so during the marriage. The trial court found that the value of the TSP on the date the parties were married was $49,862 and that the value of the TSP on the date of separation was $118,137. The trial court then concluded that the difference of $68,275, that is, the entire appreciation of the husband’s TSP during the marriage, was marital property subject to equitable distribution.
 

 We agree with the trial court’s conclusion; however, we note that the figures that the trial court used are incorrect. The value of the TSP on the date the parties were married was $118,137.29, not $49,862. The value of the TSP on the date of separation was $182,166.01, not $118,137. The parties stipulated to these figures, and the figures are supported by TSP account statements in the record. Had the correct numbers been used, and following the trial court’s method, the result would have been a marital amount subject to equitable distribution of $64,028.72 ($182,166.01-$118,137.20), not $68,275.
 

 
 *361
 
 The precise valuation of the marital portion would normally require that the appreciation of the premarital portion be calculated separately from that of the marital portion.
 
 See Anson v. Anson,
 
 772 So.2d 52, 55 (Fla. 5th DCA 2000). To prove the appreciated value of both the premarital portion and the marital portion of this account, the Husband sought to admit into evidence a spreadsheet that he had prepared along with the account statements from his TSP for the applicable period. In his testimony, the Husband explained that the annual compound appreciation on the account amounted to 2.312 percent during the applicable period. The Husband did not offer any expert opinion testimony to confirm his calculations; instead, he relied solely on his own testimony. The Wife objected to the admission of the spreadsheet on the grounds that it was not the best evidence, was not disclosed in a timely manner, and was prepared by the Husband who was not qualified to make the calculation. The trial court excluded the spreadsheet as evidence but ruled that it would consider the Husband’s extensive testimony concerning how he arrived at his results. The TSP quarterly account statements were admitted into evidence by stipulation. After consideration, the trial court found that “the Husband’s analysis and calculation of the ‘passive appreciation’ on the [TSP] contain improper assumptions and are flawed.”
 

 The Husband correctly notes that “[p]assive accumulations on the non-marital portions of an asset are not subject to equitable distribution.”
 
 Jahnke v. Jahnke,
 
 804 So.2d 513, 517 (Fla. 3d DCA 2001). However, the burden of proof on whether an asset acquired during marriage is nonmarital — here, the accumulated value of the TSP — is on the spouse asserting the claim.
 
 Id.; see also Yitzhari v. Yitzhari,
 
 906 So.2d 1250, 1254 (Fla. 3d DCA 2005) (“Once it was established that marital labor or funds were used to improve these assets, the burden then shifted to the husband to show that some, if any, portion of the enhanced value was exempt from equitable distribution.”). Our review of the record reveals that the Husband’s assumptions and calculations were — as the trial court found — flawed.
 
 [9]
 
 Expert testimony on this issue would likely have been very helpful to the trial court.
 
 [10]
 

 For the reasons stated, we affirm the trial court’s order determining that the total postmarital increase in the value of the account is subject to equitable distribution. However, we correct the trial court’s calculations. On remand, the trial court shall (1) enter an amended final judgment reflecting that the marital amount subject
 
 *362
 
 to equitable distribution is $64,028.72 and (2), to the extent that it is possible to do so, identify offsetting assets to be used to satisfy the award without requiring the partial liquidation of the Husband’s TSP account.
 
 [11]
 

 C. The Husband’s Lois Avenue Home and Illinois Condominium
 

 The parties’ marital residence (the Lois Avenue home) was purchased by the Husband in 1998, two years before the parties married. The Husband is the sole owner of the Lois Avenue home. The trial court properly determined that the home was a nonmarital asset.
 
 See Mitchell v. Mitchell,
 
 841 So.2d 564, 566 (Fla. 2d DCA 2003) (holding that the husband’s home acquired prior to marriage and titled solely in the husband’s name was nonmarital property). The trial court also correctly found that marital assets had been used to reduce the outstanding balance (the pay-down) on the home’s mortgage and that the paydown of the mortgage was a marital asset subject to equitable distribution.
 
 See id.
 
 at 567. However, the trial court erred when it determined that the amount of the paydown was $10,764.94.
 

 Here, the trial court used December 7, 2006, as the determinative date for calculating the paydown amount.
 
 [12]
 
 However, the petition for dissolution of the marriage was filed on March 8, 2005, and the unre-butted evidence was that marital assets were no longer used for payments on the mortgage after the Wife moved out of the home, which the trial court determined to be “on or about March 25, 2005.” As a result, the trial court’s use of December 7, 2006, as the determinative date for calculating the paydown was incorrect.
 
 See Steiner v. Steiner,
 
 746 So.2d 1149, 1151 (Fla. 2d DCA 1999) (differentiating between the amount of the paydown attributable to the use of marital funds versus nonmarital funds).
 

 The issue of the calculation of the amount of the paydown is complex because in 2004 the Husband refinanced the Lois Avenue home in order to satisfy the mortgage on a nonmarital condominium he owned in Illinois in which his disabled father was living. The Husband also used $3548.27 of marital assets in addition to the proceeds from the refinance to make the payoff on the Illinois condominium. The trial court found that the Husband used an additional $9541.32 of marital funds to pay down the mortgage on the Illinois condominium before refinancing the Lois Avenue home and concluded that the paydown of the Illinois mortgage resulted in a marital asset subject to equitable distribution in the amount of $13,089.59. We can find no evidence in the record to support this additional $9541.32.
 

 More important, however, the record reflects that the parties stipulated that the paydown of the first and second mortgages on the Lois Avenue home using marital funds was $7562.59, and the paydown of the mortgage on the Illinois condominium using marital funds was $3548.27, for a total of $11,110.86 for both properties combined. In addition, a spreadsheet was en
 
 *363
 
 tered into evidence during the trial, without objection, supporting these figures.
 

 Based on these facts, we conclude that the trial court’s findings that the paydown on the Lois Avenue home was $10,764.94 and that the paydown on the Illinois condominium was $13,089.59 are not supported by competent, substantial evidence. On remand, the trial court shall amend the final judgment to reflect the stipulated figures of $7562.59 as the amount of the paydown subject to equitable distribution for the Lois Avenue home and $3548.27 as the amount of the paydown subject to equitable distribution for the Illinois condominium.
 

 D. The Brokerage Accounts
 

 The trial court ruled that the entire balance of a brokerage account with E*Trade Securities, LLC (the E*Trade account), was a marital asset subject to equitable distribution. The Husband argues that the value of certain investments held in the E*Trade account were nonmar-ital assets and that the value of these investments should have been excluded from the equitable distribution. He does not dispute that the cash additions to the brokerage accounts and purchases of common stock and mutual funds during the marriage were marital property. The facts do not support the Husband’s arguments.
 

 When the parties married, the Husband owned 100 shares of AT
 
 &
 
 T, 100 shares of Microsoft, and 275 shares of Pfizer common stock in a brokerage account at Sure-trade.com. He also owned shares of American Century Ultra mutual fund, which he held in a direct investment account with American Century Investments.
 

 During the marriage, the Husband deposited $9600 of marital funds into a Sure-trade.com cash account. Then, the Husband used about $8000 of marital funds from that cash account to purchase 100 shares of Exxon Mobil common stock. During this time, Suretrade merged with Quick & Reilly, Inc. Later, the Husband transferred all of the assets from the Quick & Reilly brokerage account to a brokerage account with E*Trade Securities, LLC.
 
 [13]
 
 The Husband then deposited an additional $10,000 of marital funds into this E*Trade cash account.
 
 [14]
 
 Also, during the marriage, the parties opened a joint investment account with Janus Funds and purchased shares of Janus Growth and Income Fund.
 

 Until this point, it would have been relatively easy to trace the portion of the E*Trade account attributable to the Husband’s premarital ownership of AT
 
 &
 
 T, Microsoft, and Pfizer common stock and the American Century mutual fund. However, shortly after the transfer of these assets, the Husband liquidated
 
 all
 
 of the equity positions and deposited the cash proceeds in the E*Trade cash account. Using the money from this account, he then purchased several mutual funds. The Husband then redeemed both his American Century mutual fund and the jointly owned Janus mutual fund and deposited the cash proceeds from those redemptions into the E*Trade cash account.
 

 
 *364
 
 When the Husband liquidated all of the equity and mutual fund shares and deposited the cash proceeds in the E*Trade cash account, the assets in this account became irretrievably commingled. Any assets that previously might have been said to have any nonmarital character were dissolved into the commingled cash account. “Money is fungible, and once commingled it loses its separate character.”
 
 Pfrengle v. Pfrengle,
 
 976 So.2d 1134, 1136 (Fla. 2d DCA 2008) (citing
 
 Belmont v. Belmont,
 
 761 So.2d 406, 408 (Fla. 2d DCA 2000));
 
 see also Becker v. Becker,
 
 639 So.2d 1082, 1084 (Fla. 5th DCA 1994) (holding that because marital and nonmari-tal funds were commingled in a money market account from which money was withdrawn and used to purchase other investments, the husband was unable to establish which portion of the assets was nonmarital). Although the Husband points out that all of the brokerage accounts other than the Janus account were titled in his name alone, this fact is not relevant. “ ‘Even if an account is titled in one spouse’s name alone, it may become marital if both marital and nonmarital funds are commingled in that account.’ ”
 
 Pfrengle,
 
 976 So.2d at 1136 (quoting
 
 Steiner v. Steiner,
 
 746 So.2d 1149, 1150 (Fla. 2d DCA 1999)).
 

 Accordingly, the trial court correctly found that the Husband failed to sustain his burden of demonstrating the existence of a nonmarital portion of the E*Trade account. In addition, the trial court did not abuse its considerable discretion in valuing the account as of the trial date. Section 61.075(6), Florida Statutes (2006), gives the trial court wide discretion in this regard:
 

 The date for determining value of assets and the amount of liabilities identified or classified as marital is the date or dates as the judge determines is just and equitable under the circumstances. Different assets may be valued as of different dates, as, in the judge’s discretion, the circumstances require.
 

 Thus the trial court correctly found that the entire balance of the E*Trade account on the date of trial, December 7, 2006, which the trial court determined to be $103,826.83, was a marital asset subject to equitable distribution.
 

 E. The Husband’s Life Insurance
 

 When the parties married, the Husband already had in force a variable universal life insurance policy issued by IDS Life Insurance Company, a subsidiary of American Express Financial Advisors, Inc. (AEFA).
 
 [15]
 
 The issue before the trial court was what portion — if any — of the cash surrender value of the policy was a marital asset subject to equitable distribution.
 

 In its final judgment, the trial court correctly found that approximately $7200 in marital funds had been used to fund the policy for a period of eighteen months. The trial court then concluded that because the Husband ceased contributions to the policy, this $7200 was now being used to pay the insurance premiums and fees, with the result that “[t]he depreciation in the value of the asset is not the result of passive or active market forces.” Based on this, the trial court concluded that it would be inequitable to apportion part of the loss in the value of the insurance to the Wife. Based on these factors, the trial court determined that the entire cash surrender value of the policy as of the date of
 
 *365
 
 the parties’ separation, $23,125.87, was a marital asset subject to equitable distribution. The trial court’s analysis was incorrect.
 

 We begin our discussion by noting that the characteristic of variable life insurance (VL) or variable universal life insurance (VUL)
 
 [16]
 
 that distinguishes it from whole life or universal life is the presence of a separate account within the policy of insurance. This separate account contains investment choices, usually mutual funds, into which the owner of the policy may invest. When a premium is paid into a VUL policy, the insurance company deducts the cost of insurance and certain fees, and the remainder is invested in the funds in the separate account chosen by the owner of the policy.
 
 See
 
 Joan E. Boros & W. Randolph Thompson,
 
 A Vocabulary of Variable Insurance Products,
 
 902 PLI/Comm. 9, 28 (2009). The ramifications of this arrangement are significant in the context of the equitable distribution of a marital estate. Because the separate account of a VUL policy is, in essence, no different than a brokerage account, the considerations involved in attempting to establish the value of the marital portion of the policy are not the same as the considerations relevant to the determination of the cash value of other types of cash value policies, such as whole life. Instead, the value of the separate account of a VUL policy must be derived in the same manner as one would determine the value of securities held in a brokerage account.
 

 At trial, the Husband proffered account statements for his VUL policy covering the entire period of the marriage and a spreadsheet that he had prepared showing the history of the investment cash flows from June 2000 through May 2005. The account statements were entered into evidence by stipulation and the spreadsheet was admitted into evidence without objection. From these documents and from the testimony at trial, we can derive the information necessary to calculate the value of the portion of the VUL policy subject to equitable distribution.
 

 According to the Husband’s unrebutted testimony, the cash value of the account when the parties married was $33,233.28.
 
 [17]
 
 The Husband’s monthly contributions were $400 per month. After a deduction to cover the cost of insurance and fees, the remainder of the contribution was invested in the separate account in an Equity fund (40%), a Managed fund (40%), and an International Equity fund (15%), with the remaining five percent going to a fixed (cash) account. On the date of the marriage, the Husband owned 2259.035907 shares of the Equity fund, 2533.642248 shares of the Managed fund, and 778.931379 shares of the International Equity fund, with about $1500 in the fixed account.
 

 In December 2001, about eighteen months into the marriage, the Husband determined that the investments in the separate account were performing poorly, and he decided to stop making his monthly contributions to the policy. By this time, the value of the investments in the separate account had decreased to approximately $24,000. Although the overall account value had decreased, the number of shares in each fund had increased. At this point, the account contained: Equity, 2817.974800 shares; Managed, 3262.937300 shares; and International Equity,
 
 *366
 
 1330.888000 shares. The fixed (cash) account contained about $1327.
 

 Because we know the number of shares owned at the beginning and at the end of this eighteen-month period, we can simply subtract the number of shares held at the beginning of the period from the number of shares held at the end of the period to determine the number of shares purchased with marital funds. Thus, the shares purchased during this period were Equity,
 
 558.9S889S
 
 (2817.974800-2259.035907); Managed,
 
 729.295052
 
 (3262.937300-2533.642248); and International Equity,
 
 551.956621
 
 (1330.888000-778.931379). These shares were the only shares purchased with marital funds; therefore, they are the only assets in this account which are marital assets subject to equitable distribution.
 

 The number of shares remained constant until July 2004, when IDS/AEFA merged them with its AXP mutual funds. As a result of this conversion, the 2817.974800 shares of the Equity fund became 13,355.498200 shares of AXP VP Large Cap Equity fund, the 3262.937300 shares of the Managed fund became 11,-659.945800 shares of AXP VP Managed fund, and the 1330.888000 shares of the International Equity fund became 3401.104000 shares of the AXP VP International fund. There was no change in the value of the total shares of each fund when the conversion occurred. Afterwards, the number of the new converted shares remained constant through March 8, 2005— the date the petition for dissolution was filed.
 

 Because the conversion was straightforward and there was no further fluctuation in the number of shares, we can determine the number of shares of the newly converted funds that were marital property by applying the percentages of shares which had been purchased with marital funds before the conversion. Before conversion, the marital interest in the Equity fund was 19.835% (558.938893/2817.974800); in the Managed fund, 22.351% (729.295052/3262.937300); and in the International Equity fund, 41.473% (551.956621/1330.888000). Applying these percentages to the converted shares, the marital portion of the shares in the separate account at the time the petition was filed was AXP VP LC Equity, 2649.063068 shares (13,355.498200 x .19835); AXP VP Managed, 2606.114486 shares (11,-659.945800 x .22351); and AXP VP International, 1410.539862 shares (3401.104000 x. 41473).
 

 Based on the approximate value per share
 
 [18]
 
 at the time of the petition, this equates to:
 

 AXP VP LC Equity: $1859.90 (2649.063068 x $0.702098/sh)
 

 AXP VP Managed: $1865.75 (2606.114486 x $0.715911/sh)
 

 AXP VP Int’l: $1324.26 (1410.539862 x $0.938835/sh)
 

 Thus, at the time the petition was filed, the-total value of the shares purchased with marital funds during the marriage was approximately $5049.91.
 
 [19]
 

 Based on the above, we conclude that the trial court erred in declaring the entire surrender value of the policy a marital
 
 *367
 
 asset subject to equitable distribution.
 
 [20]
 
 On remand, the trial court shall enter an amended final judgment reflecting that the value of the portion of the VUL policy subject to equitable distribution is $5049.91. Alternatively, the trial court may, in its discretion, choose to value the shares at the time of trial if it can determine the value of the shares on that date.
 
 See
 
 § 61.075(6). Because this is an insurance policy, the trial court may choose to identify offsetting assets to satisfy the award without requiring the partial surrender or liquidation of the securities in the VUL policy’s separate account in order to avoid potential tax consequences or surrender charges.
 

 F. The Husband’s 1940 Pontiac
 

 The Husband owns a 1940 Pontiac
 
 [21]
 
 that his grandfather gave him while the Husband was in high school. The Husband testified that he had not seen the car since 2001. According to the Husband, the car is in the care of someone in Bloom-ington, Indiana, to whom the Husband has not spoken in two years. The Husband failed to include this asset on his financial affidavit. The Wife included the car on her financial affidavit, identifying it as the Husband’s property, and listed its current fair market value as $15,300. The Husband testified that the vehicle had no value. No other evidence concerning the value of the vehicle was presented at the final hearing. The trial court found that the Husband had not satisfied his burden of proving that the vehicle was nonmarital property and ordered the car to be sold and the net proceeds to be divided equally between the parties.
 

 We reverse this aspect of the final judgment. The only evidence before the trial court established that the car was the premarital property of the Husband. Other than the Husband’s testimony that the car had no value, there was no competent, substantial evidence to prove the car’s current value. More important, there was no evidence that the automobile’s value had increased during the marriage as the direct result of the use of marital funds. On remand, the trial court shall award the 1940 Pontiac to the Husband as his non-marital property.
 

 G. The Husband’s Sister’s Paintings
 

 We now come to the final item in our discussion — eight paintings, all produced by the Husband’s sister. The Husband testified that seven of the eight paintings were given to him by his sister prior to the marriage and that the eighth painting, although given to him during the marriage, was a personal gift to him from his sister. He testified that the eighth painting was accompanied by a tag that said, “To Chris[,] from your favorite sister.” The Husband also testified that the paintings were all in the Lois Avenue home at the time of the couple’s separation but that after the Wife had moved out, she had reentered the home and taken the paintings.
 

 The Wife testified that only three of the paintings were given to the Husband by his sister before they were married and that the Husband’s sister gave the other five to the couple after they were married. She also testified without objection that the Husband’s sister intended to give “some” of the paintings to the Wife. How
 
 *368
 
 ever, the Wife’s claim to ownership of at least some of the paintings was undercut by her own testimony. When asked if there was an agreement between the Husband and her concerning the paintings, the Wife responded that the Husband had told her that she could have copies. The Wife testified further that the value for the paintings that she had entered on her proposed distribution list represented only the cost of making and framing copies of the paintings.
 

 After finding that the evidence was conflicting and concluding that the paintings were marital property, the trial court ruled that “each party shall be entitled to keep the painting(s) in that [party’s] current possession.” However, the testimony at trial established that the Wife had possession of all eight of the paintings. If this is so, the ruling that each party would keep the paintings currently in that party’s possession effectively awarded all of the paintings to the Wife. Such a result is not only inequitable, it is also unsupportable based on the undisputed testimony at trial.
 

 Based on the testimony of both parties, the record establishes that the Wife conceded that the paintings were not marital property and that she reached an agreement with the Husband that she would be able to obtain copies. Accordingly, on remand, the trial court shall order the Wife to return all of the paintings in her possession to the Husband. In addition, if the parties are unable to agree on arrangements for the Wife to obtain copies of the paintings, the trial court may take additional evidence and issue an appropriate order resolving any disputed issues about the arrangements for copying, including which party shall bear the cost of having the copies made.
 

 III. CONCLUSION
 

 We affirm the trial court’s award to the Wife of bridge-the-gap alimony, temporary alimony, and temporary attorney’s fees. We also affirm the trial court’s refusal to impose a constructive trust on the Husband’s Lois Avenue home. We reverse the financial aspects of the final judgment as discussed above and remand for such further proceedings as may be necessary and for the entry of an amended final judgment consistent with this opinion. In all other respects, we affirm the final judgment of dissolution of marriage.
 

 Affirmed in part, reversed in part, and remanded.
 

 FULMER and KELLY, JJ., Concur.
 

 [1]
 

 . The parties were married on June 25, 2000. The petition for dissolution was filed March 8, 2005. The final judgment of dissolution of marriage was entered on April 2, 2007. The parties had no children from this marriage.
 

 [2]
 

 . With regard to the Wife, this omission is particularly difficult to understand. As part of the temporary award to the Wife, the trial court ordered the Husband to pay the Wife $3000 toward her fees for a forensic accountant.
 

 [3]
 

 . We note that the parties’ appellate attorneys did not represent them in the trial court.
 

 [4]
 

 . The Wife did not contest the Husband's claim that he is employed under FERS as opposed to the earlier Civil Service Retirement System (CSRS).
 

 [5]
 

 . The problem examined here was caused, in part, by the Husband, who listed his annual leave and sick leave hours at $61,720 as a contingent asset on his family law financial affidavit. The sick leave comprised most of this item, but the sick leave was not an asset. We understand the Husband’s confusion, because the form for the financial affidavit instructs the party to list "any POSSIBLE assets” including "accrued vacation or sick leave” and does not provide space for an explanation. The Husband or his trial attorney apparently entered this information in an abundance of caution, erring on the side of full disclosure. Nevertheless, this entry, combined with the Wife's statement in her proposed findings of fact that such hours could be "banked,” created confusion. The confusion was compounded when the issue was not adequately addressed at trial. These factors combined to lead the trial court into error.
 

 [6]
 

 .Under FERS, employees may accumulate a maximum carryover of 240 hours annual leave per year.
 
 See
 
 5 U.S.C.A. § 6304 (West
 
 *360
 
 2006). Unused leave under FERS is lost if not used prior to the end of the first pay period of the year following the year the leave is earned.
 
 Id.
 

 [7]
 

 . Had the husband accumulated and kept more annual leave hours than he had at the beginning of the marriage, the excess might have been subject to equitable distribution. See
 
 Guillen v. Guillen,
 
 751 So.2d 1270, 1272 n. 3 (Fla. 3d DCA 2000) (noting that several courts have deemed proper the distribution of the cash value of leave balances upon dissolution of marriage).
 

 [8]
 

 . H.R. 5573, introduced in the House of Representatives on March 10, 2008, proposed to provide for lump-sum payment of unused sick leave for FERS retirees. The bill did not become law.
 

 [9]
 

 . The Husband included only the employee contributions in his calculations for the period from July 2000 through May 2003 but included the employee contributions plus the employer’s automatic one percent contribution plus the employer’s matching amount for the period from June 2003 through March 2004. This led to his erroneous conclusion that the overall rate of return was 2.312 percent. In fact, the actual annualized return appears to be less than one percent.
 

 [10]
 

 .
 
 See
 
 A. Matthew Miller & Jerry Reiss,
 
 Determining the Nonmarital Portion of Retirement Benefits and Other Property,
 
 81 Fla. B.J. 34, 34 (Feb. 2007). We also note that issues concerning the TSP would have been much easier to address if the Husband had provided statements showing the actual number of shares of each fund owned, rather than as a dollar figure. If the Husband had done so, the appropriate calculation would have been a relatively simple matter of determining the number of premarital shares and the number of shares acquired during the marriage and determining their value at the time of the dissolution. But the statements provided by the Husband do not reflect the number of shares in the different funds in the TSP until June 2003, when those numbers begin to appear in the statements that he provided.
 

 [11]
 

 . Because the contributions to the TSP consisted of the Husband’s pretax deferred compensation accompanied by contributions from this employer, any withdrawals from this plan may cause the Husband to incur both a tax liability and a penalty.
 

 [12]
 

 . The December 7, 2006, date appears in Section I.B. 2. of the final judgment in a table reflecting the equitable distribution of the parties’ marital assets. However, in a discussion of the pertinent factors that the trial court considered in arriving at the equitable distribution appearing in Section I.E. a. of the final judgment, it referred to October 7, 2006, as the determinative date for establishing the paydown amount.
 

 [13]
 

 . The items transferred included 117 shares of AT & T Wireless, 200 shares of Exxon Mobil, 200 shares of Microsoft, 275 shares of Pfizer, and $12,683.44 from the cash fund. The difference in the number of shares resulted from a reorganization at AT & T and stock splits of Exxon Mobil and Microsoft. These shares were still, at this point, the Husband’s nonmarital assets.
 

 [14]
 

 . The date of this deposit is unknown. The only evidence of this transaction in the record is an undated printout of the Husband’s E*Trade account.
 

 [15]
 

 . In 2005, AEFA became Ameriprise Financial, Inc., and separated from the American Express Company.
 
 See
 
 http://www. ameriprise.com/ab out-ameriprise-finan-cial/company-information/ key-facts.asp (last visited March 6, 2009)
 

 [16]
 

 . The policy at issue in this case is a VUL.
 

 [17]
 

 . We cannot verify this number from the statements in the record because the first available statement covers the period from May 15, 2000, through August 9, 2000. However, it appears to be a reasonably accurate interpolation from the data available.
 

 [18]
 

 . The closest date we could find in the record for which the net asset values of these shares were listed was April 5, 2005. There was not a significant variation in the value of the shares around this time.
 

 [19]
 

 . Slightly different results might be obtained depending on rounding and the number of places considered beyond the decimal point. Also, this figure does not consider the value of the fixed account because that account had been almost totally depleted by the time the petition was filed.
 

 [20]
 

 . In fairness to the trial court, we note that the parties did little to assist it in determining the values of the nonmarital and marital portions of this asset.
 

 [21]
 

 . The parties do not describe the car or name the model. From the photograph in the record, the car appears to be a 1940 Pontiac Deluxe 4-door Touring Sedan and is in very poor condition. We do not know when the photograph was taken.