STOWERS, Chief Justice.
I. INTRODUCTION
A husband appeals multiple aspects of a divorce order. He argues that his wife's bank accounts, personal leave from her job, and house should be treated as marital property; that he should be reimbursed for damage his wife allegedly caused to his separate property and to marital property he received (which he also alleges the superior court over-valued); that he and his wife should share legal and physical custody of their children; and that the conditions placed on his unsupervised visitation with the children were unwarranted. We affirm the court's decisions for the most part; however, we vacate and remand on the classification of the wife's bank accounts and the valuation of the husband's damaged property.
II. FACTS AND PROCEEDINGS
A. Background Facts
Cynthia Deneen Pasley (Cindy) and David Sean Pasley (Sean) married in August 2005. They separated in February 2014 and Cindy filed for divorce in March. A divorce trial was held across 11 days spanning May through October 2016. The superior court issued an order after trial in December 2016 and an order after a motion for reconsideration in January 2017. Sean appeals multiple aspects of the court's decision, which are summarized in the next section. Part IV presents additional facts relevant to his appeal in further detail.
B. Summary Of Sean's Arguments
1. Cindy's bank accounts
Cindy had a checking account which existed prior to the marriage. During the marriage Cindy deposited her paychecks in the checking account. Sean cashed his paychecks and provided cash to Cindy. Cindy deposited these funds in her checking account, and she paid the marital bills from this account. Cindy *742 testified that, out of a balance of over $ 15,000, $ 2,000 belonged to her adult son, Robert, and another $ 10,000 consisted of child support payments held for her adult children.[1]
Cindy also had a savings account with a balance of about $ 22,000 at the time of separation. Cindy claimed that $ 10,000 in that account belonged to Robert and the remainder was comprised of child support payments held for her children.
The superior court valued the marital portion of the checking account at $ 3,559.33. It valued the marital portion of the savings account at $ 11,652.60. The court's only finding with respect to Cindy's bank accounts was that "$ 12,000 of the ... accounts belongs to Cindy's son, Robert, and therefore the value of those accounts is reduced."
Sean argues that both accounts should be viewed as entirely marital.
2. Cindy's personal leave
From prior to the marriage until March 2013, Cindy accrued personal leave through her employer. When Cindy married Sean, she had 483 hours of accrued leave.[2] Her "balance" of hours available changed as she earned and expended leave during the marriage, never falling below 438 hours. When the parties separated in February 2014, Cindy had 534 hours of leave available. She "cashed out" these hours in June 2014.
The parties disagreed over how to "trace" this asset. Sean proposed a first-in, first-out method while Cindy argued for a last-in, first out approach. Under Sean's proposal, Cindy consumed all her premarital leave hours, and her entire balance at separation was marital property. Using Cindy's approach, leave earned during the marriage was used whenever it was available, preserving most of her premarital leave as separate property. The superior court rejected Sean's first-in, first-out method and equally divided the small portion of Cindy's leave that it designated as marital property.
On appeal Sean recapitulates his argument for first-in, first-out tracing.
3. Cindy's house
Cindy owned a house prior to the marriage, which she and Sean used as the marital home. Cindy retained exclusive title to the house throughout the marriage, including when she refinanced it. Cindy asserted that Sean's credit was not used to improve the property. Sean testified he remodeled parts of the house, but Cindy maintained she paid him for this work. The superior court found Cindy more credible on this point and found Sean did not conduct ongoing maintenance of the property.
Sean gave Cindy part of his paychecks in cash, which she then deposited in the bank account that she used to pay the mortgage on the house; Sean testified he believed he was contributing to the mortgage, but Cindy maintained she alone paid that expense. Sean argued that Cindy's house had transmuted into marital property, but the court found that the house remained Cindy's separate property.
Sean appeals this finding.
4. Sean's possessions
Sean was arrested on February 13, 2014, for fourth-degree assault, and on February 14 Cindy filed for and received an ex parte domestic violence protective order. Under the protective order's terms Sean did not have access to the marital home throughout the divorce case.
In April Sean obtained a writ of assistance to retrieve his possessions from the home. Cindy had packed his belongings and left them either in the front yard or in Sean's van, which had been parked on the premises.
*743 Sean was only allowed a limited amount of time to retrieve his possessions, and he ended up leaving with some possessions still in the yard and without his van. A few weeks later a mutual friend of Sean's and Cindy's retrieved the van. Sean's possessions left in the yard remained there until September, when a moving company retrieved them for Sean.
Sean alleged that many of his possessions were ruined either because Cindy damaged them while packing or because they remained outside for so long. He also claimed that Cindy was responsible for his delay in retrieving the possessions that had been left outside. Cindy countered that Sean's possessions were damaged before they separated, and she introduced photographs showing the general state of Sean's possessions during the marriage. She testified she exercised reasonable care in packing them and Sean was responsible for the delays in retrieving his possessions.
Sean also argued that the damaged items should be valued at replacement cost and these amounts should be assigned to Cindy because she damaged them. On his property spreadsheet Sean listed his estimates of replacement costs for the damaged items. In the alternative, he requested that the property be valued at zero.
The court awarded the items to Sean and assigned non-zero values for this property. Sean appeals, arguing both that Cindy's conduct was not reasonable and that the court over-valued the damaged items.
C. The Children
Sean and Cindy have two boys. Both are in elementary school and have special needs. Cindy requested sole legal and primary physical custody, while Sean requested joint legal and shared physical custody.
The superior court found that Sean had a history of perpetrating domestic violence against Cindy. This was apparently based on a separate domestic violence protective order that concluded Sean committed two or more acts of domestic violence against Cindy.[3] Sean completed an intervention program for batterers.[4]
Both parties used illegal drugs in the past. During an altercation shortly before the parties separated, Sean told Cindy that he was using methamphetamine. He testified he believed she was using methamphetamine and he wanted her to admit it. Both parties testified they found what they believed to be methamphetamine in the house and they believed the other party was using it. Cindy introduced into evidence photographs of what she believed to be drugs and drug paraphernalia. In results submitted to the court, both parties' hair samples tested negative for all drugs.
The court heard testimony from three individuals regarding the parties' emotional and psychological profiles. Kevin Lankford completed psychological evaluations for both Sean and Cindy. Lankford had no concerns about Cindy's test results, but he diagnosed Sean with unspecified personality disorder with paranoid and narcissistic tendencies. He recommended that Cindy be given final authority regarding the children's mental and academic needs. He also recommended that both Sean and Cindy participate in therapy.
Sean's counselor, David Bates, disagreed with Lankford and did not believe that Sean *744 had a personality disorder. On cross-examination, he conceded he relied almost solely on Sean's self-reporting for the assessment.
Jocelyn Bowman was appointed as child custody investigator for the case. Bowman's report noted that the children were reluctant to separate from Cindy, and Bowman ascribed this to their shared trauma. She said that Sean lacked self-awareness about how his emotional outbursts affected his family and he had not been accountable for the distress he caused. But she wrote that the children value their relationship with Sean and want to "experience his positive attention" for more than four hours of weekly, supervised visitation. Bowman recommended that Cindy receive sole legal and physical custody of the children. Shared legal custody would be proper if Sean could overcome the domestic-violence presumption barring custody, and Bowman suggested that shared physical custody might be appropriate if Sean could additionally demonstrate he was drug-free and otherwise fit. Bowman recommended that Cindy retain final decision-making authority if custody were shared.
The superior court awarded Cindy sole legal and primary physical custody, relying mainly on the testimony of Lankford and Bowman. It allowed Sean unsupervised visitation as long as a list of conditions were met. Among these were that Sean would obtain a hair follicle test for controlled substances every week for six months following the court's final custody order. And if Sean's latest substance abuse evaluation was completed more than six months before the order, he would have to obtain an updated substance abuse evaluation.
Sean moved for reconsideration, arguing that the requirements of weekly testing and a new substance abuse evaluation were unduly burdensome. He explained that each hair follicle test costs $ 230 and his most recent substance abuse evaluation was one week too old, requiring a new one. Cindy responded by recommending that the number of drug tests be reduced to one per month, and the court adopted Cindy's recommendation in its order on reconsideration.
Sean appeals both the superior court's custody award and these two visitation conditions.
III. STANDARD OF REVIEW
"There are three basic steps in the equitable division of marital assets: (1) deciding what specific property is available for distribution, (2) finding the value of the property, and (3) dividing the property equitably."[5] The first step - characterizing property as either marital or separate - " 'may involve both legal and factual questions.' Underlying factual findings as to the parties' intent, actions, and contributions to the marital estate are factual questions."[6] We review factual findings for clear error, which exists "only when we are left with a definite and firm conviction based on the entire record that a mistake has been made."[7] "[W]hether the trial court applied the correct legal rule ... is a question of law that we review de novo using our independent judgment."[8] "The second step, the valuation of property, is a factual determination that we review for clear error."[9] "We review the third step, the equitable allocation of property, for an abuse of discretion, reversing only if it is 'clearly unjust.' "[10]
"The superior court has broad discretion in child custody determinations."[11] Custody and visitation decisions "will be set aside only if 'the record shows that [the] controlling findings of fact are clearly erroneous *745 or the court abused its discretion.' "[12] "An abuse of discretion is found 'if the superior court's decision is clearly unreasonable under the totality of the circumstances' or 'if the superior court considered improper factors in making its custody determination, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others.' "[13]
IV. DISCUSSION
A. Cindy's Bank Accounts
1. The law of classification of secondary assets
In order to review the superior court's classification of Cindy's bank accounts, we must first describe the process of tracing a secondary asset.
a. Tracing generally
"Assets acquired during marriage 'as compensation for marital services' - most commonly salaries earned by either spouse during marriage - are considered primary marital assets."[14] Assets acquired by one spouse before marriage, property acquired by gift, and property acquired by inheritance are primary separate assets.[15] Assets acquired "through exchange, appreciation, or income" are secondary assets, and their classification as marital or separate depends on their source asset.[16]
Tracing is the process of classifying a secondary asset by identifying its source asset.[17] If a source asset is primary marital property, then the secondary asset is secondary marital property, while a source asset that is a primary separate asset yields a secondary separate asset.[18] However,
if the source asset itself is secondary property, tracing continues until either a primary separate or primary marital source asset is found. "The process of tracing can therefore be simply described as a search of sources backward through time until every asset is linked to primary marital or primary separate property."[19 ]
Because a secondary asset can have more than one primary asset, it is possible to have mixed secondary assets.[20] To characterize a mixed secondary asset,
the superior court must know the character of each source feeding into the mixed asset and the amount of value each source contributed to the mixed whole. The court can then determine the ratio between the sources. "The marital and separate interests in a mixed secondary asset are ordinarily in the same ratio as the marital and separate contributions used to acquire the asset."[21 ]
The tracing process stops once it is not possible to further trace a secondary asset back to its primary sources.[22] Because the party seeking to establish that property is separate bears the burden of proof, untraceable assets are marital property. Furthermore, an asset is marital even if its sources are known but *746 the ratio of marital to separate property in the source is unknown.[23] In such a case, the unknown contribution from the separate source is said to transmute by commingling to become marital property.[24]
b. Multiple destination tracing
If the source of a secondary asset is some, but not all, of a mixed asset, tracing becomes more complicated. The secondary asset that is being traced could be a marital asset if it came from the marital portion of the source asset, a separate asset if it came from the separate portion, or a mixed asset if it came from both marital and separate portions of the source asset.[25] This also affects the classification of the source asset: deductions of marital or separate property may change the ratio of marital to separate property remaining in the asset.[26] The process of determining the final ratio in these situations is called "multiple destination tracing."[27]
If funds were withdrawn from a mixed secondary asset and "sufficient marital and separate funds were available [in that asset] to cover [the] withdrawal, the classification of the funds withdrawn depends upon the intent of the spouse who made the withdrawal, determined as of the time the withdrawal was made."[28] In making this determination, the following principles should guide the court.
"The most powerful type of evidence used to show the contemporaneous intent of the withdrawing spouse is a close equivalence between the amounts of specific withdrawals and deposits."[29] In these situations, "[t]he commingled account is being used as a mere conduit to move separate funds from one place to another."[30] Strong evidence for this are transactions with an "exact equivalence in amounts and [a] close equivalence in time."[31] "If the original deposit is proven to consist of separate funds, the withdrawal would likewise be separate."[32]
Contemporaneous records may also support a finding of intent behind withdrawals of funds.[33] "If the records were prepared at the time when the various deposits and withdrawals were made, and if the records are generally found credible by the trial court, the court is permitted to accept the accuracy of the records."[34]
When determining the intent of the transferring spouse, "[i]t is essential to understand ... that there is a major distinction between the contemporaneous intent of the spouse who made the withdrawal and that spouse's trial testimony . The relevant issue is intent at the time of the withdrawal, not intent at the time of the divorce trial."[35] The inquiry into a spouse's contemporaneous intent presents the same type of problem as contract interpretation: "While we are endeavoring to give effect to the intention of the parties, looking to their testimony as to their subjective intentions or understandings will normally accomplish no more than a restatement of their conflicting positions."[36] A court must instead try to determine the reasonable expectation or understanding of the relevant party.[37] Because a spouse's actual intent at the time of the withdrawal may conflict with the spouse's interests at the time of the divorce trial,[38] "the trial testimony *747 of the parties must be viewed with careful skepticism."[39]
c. Evidence to establish tracing generally
Because of the need for such "careful skepticism," a party attempting to trace property has the burden of proving specific facts to establish each link in the tracing chain.[40] If a party attempts to prove a link in the chain solely through testimony, the superior court should generally ask three questions.[41] First, with what degree of specificity would the party ordinarily be expected to remember such a transaction? What documentation of such a transaction would ordinarily be available to the party attempting to prove its existence? Finally, is the testimony neutral or self-serving? In answering these questions, courts must take the parties - and the available evidence - as they are:
While ... precise requirements for non-marital asset tracing may be appropriate for skilled business persons who maintain comprehensive records of their financial affairs, such may not be appropriate for persons of lesser business skills or persons who are imprecise in their record-keeping abilities. This problem is compounded in a marital union where one spouse is the recorder of financial detail and the other is essentially indifferent to such matters. Moreover, such a requirement may promote marital disharmony by placing a premium on the careful maintenance of separate estates.[42 ]
Ultimately, whether each link in the tracing chain has been established is a question of fact best left to the superior court.[43]
2. The findings with respect to Cindy's bank accounts are insufficient for appellate review.
A trial court is required "to articulate the reasons for its holding where those reasons are not apparent from the record."[44] "[T]he trial court must provide '[a]dequate findings of fact ... so that a reviewing court may clearly understand the grounds on which the lower court reached its decision.' "[45] Otherwise, "the order becomes essentially unreviewable by this court."[46] "Whether there are sufficient findings for informed appellate review is a question of law."[47]
At the time of separation, Cindy's checking account had a balance of $ 15,559.33 and her savings account had a balance of $ 22,652.60. Cindy testified that $ 2,000 in the checking account belonged to her adult son, Robert, and she said that "over $ 10,000" in the account consisted of child support payments held for her adult children. She testified that she was holding another $ 10,000 for Robert in the savings account and that the remainder of that account was marital property.
But during closing arguments, Cindy's attorney asserted that the checking account contained $ 12,000 held for Robert and that the savings account was entirely the property of Cindy's adult children. Sean asked for both accounts to be viewed as entirely marital.
*748 In its order after trial, the superior court valued the marital portion of the checking account at $ 3,559.33 and the marital portion of the savings account at $ 11,652.60. Its only relevant finding of fact was that $ 12,000 belonged to Cindy's adult son, Robert.
In his motion for reconsideration, Sean noted the deduction of $ 11,000 from the savings account in addition to the offset for Robert's funds: "It is unclear if this is a mistake[ ] or if there is other reasoning for the court's valuations." Cindy insisted that the court was correct, offering a revised property spreadsheet adopting the court's $ 11,652.60 value for the savings account. The court used Cindy's proposed order on reconsideration, which stated that Cindy's final property spreadsheet "contains both the parties' arguments and the fair and equitable distribution of the marital estate reached by this Court."
We are unable to determine the reasoning of the superior court. The court's only finding does not lead to its ultimate valuation: Cindy testified Robert's funds consisted of $ 2,000 in her checking account and $ 10,000 in her savings account, which would leave account balances of $ 13,559.33 and $ 12,652.60, respectively.[48] We have found no testimony or evidence supporting the superior court's decision on reconsideration apart from Cindy's revised property spreadsheet submitted in her response to Sean's motion for reconsideration. As explained, that spreadsheet merely adopted the court's original determination in its first property order. Therefore, we must remand for the court to make additional factual findings.
It is also unclear from the court's order whether it properly applied the tracing analysis; there is no mention of tracing in its decision. To the extent the court failed to attempt to trace Cindy's accounts, this was error. On remand the court should engage in a tracing analysis as outlined in this opinion and explain its findings.
Finally, we caution trial courts that the intent and actions of the parties in handling finances during the marriage are only relevant to certain inquiries. For example, the superior court here commented:
[T]he parties in this case made significant and unusual efforts to keep their finances separated during the marriage. As a result, the parties' finances are much less commingled than those of most married couples, and premarital property that most couples would have transmuted to marital property did not transmute in this case.
While engaging in a tracing analysis, trial courts may consider the parties' financial habits when determining their intent. However, courts should be careful not to rely too heavily on the parties' financial habits when characterizing property as marital or separate. Most assets acquired by either party during the marriage will be marital assets, regardless of the intent or habits of the parties.[49]
We vacate the superior court's order regarding Cindy's bank accounts and remand for the court to engage in a tracing analysis and make additional factual findings. On remand the superior court may, in its discretion, take additional evidence.[50]
*749 B. Cindy's Personal Leave
In Schober v. Schober we held that unused personal leave accrued during a marriage is a marital asset, explaining such leave "is akin 'to pension or retirement benefits, another form of deferred compensation.' "[51] This case requires us to consider what portion of unused personal leave is marital and what portion remains separate when a party enters a marriage with accumulated personal leave. We apply the same tracing principles discussed above to this analysis.
Leave is like money: it may be accumulated or spent. Each hour of leave is worth a certain amount of money.[52] Thus leave can be treated like money in a bank account. Cindy's leave "account" was a mixed secondary asset because it had both marital and separate sources. The separate source asset was the leave Cindy had already accrued when she married Sean; the marital source asset was the leave she accrued during the marriage. The question is whether the leave "withdrawn" during the marriage was marital or separate leave. We conclude that a party who uses accrued personal leave during a marriage first uses marital leave if such leave is available; only after all marital leave has been exhausted does the party start using separate leave. This conclusion is consistent with the rule that leave earned during the marriage is marital[53] and the presumption that expenditures during a marriage are marital.[54] This is also consistent with the general rule that "only marital property is subject to division upon divorce" while separate property "is subject to 'invasion' only 'when the balancing of the equities between the parties requires it.' "[55] Here, the superior court was not faced with the need to invade any separate property for purposes of equitable distribution.
Cindy had 483 hours of leave on August 14, 2005 when she and Sean married. She earned these hours prior to the marriage and therefore they were her separate property; by contrast, hours earned after August 14 were marital leave. The lowest amount of leave Cindy had during the marriage was 438 hours on September 1, 2005. At that point, Cindy had used all accrued marital leave plus 45 hours of her separate leave; the remaining 438 hours of leave were still separate. Thereafter Cindy continued to accrue and use marital leave, but her total leave "balance" never fell below 438 hours; she did not use any more separate leave. When the parties separated, Cindy had 534 hours in her leave "account." This total, less the 438 hours of premarital leave Cindy retained, left 96 hours of marital leave - the same balance calculated by the superior court.[56]
We affirm the superior court's classification of Cindy's personal leave.
*750 C. Cindy's House
1. The law of transmutation by implied interspousal gift
We recently clarified the law of transmutation by implied interspousal gift in Kessler v. Kessler .[57] Transmutation "occurs when one spouse intends to donate separate property to the marital estate and engages in conduct demonstrating that intent."[58] In Kessler we cautioned that the so-called " Cox factors" are relevant but not dispositive.[59] These factors "are merely specific facts that may, in particular cases, serve as evidence of the owning spouse's donative intent."[60] The outcome of any one factor is "not a proxy for the ultimate question: did the owning spouse intend to donate his or her separate property to the marital estate?"[61]
"The burden of proving an implied gift lies upon the party who claims one."[62] "Whether a spouse intended to donate his or her separate property to the marital estate is a factual finding that we review for clear error."[63]
2. It was not clearly erroneous to find Cindy's house did not transmute into marital property.
The superior court found that Cindy did not intend to donate her premarital house to the marital estate. Evidence in the record supports this finding. Cindy owned the house when the parties married. Cindy never placed title to the property in joint ownership. Cindy testified that, when she refinanced the home loan after the parties married, Sean signed a document to reverse the erroneous addition of his name to the title and mortgage. Sean did not dispute he signed a document at Cindy's direction during the refinancing process. While neither party produced this document at trial, the undisputed testimony regarding its existence supports the court's conclusion. At trial, Sean even complained of being "denied the opportunity" to manage the mortgage and related affairs. Sean's credit was not used to improve the property, and nothing in the record suggests that Cindy made any statement that she intended to give Sean an interest in the property.[64]
Sean argues he and Cindy lived in the home throughout the entirety of their marriage. But we have held "the mere use of a separate asset for marital purposes cannot transform the separate asset into a marital asset."[65] In Kessler we stated: "Given the lack of further evidence of donative intent, we conclude that the couple's use of the property as the marital residence shows only that the [home] served an important marital purpose."[66]
Sean also claims that he contributed to mortgage payments because he gave cash to Cindy that she put in the bank account from which she paid the mortgage. Sean testified these payments were to cover his share of marital responsibilities, which he took to include the mortgage. Cindy testified she did *751 not view the payments as including support on the mortgage. In Kessler the superior court found the husband "would not have been able to [pay the mortgage or condominium fees] without the financial contributions" of the wife, yet we concluded,
[N]either [the wife] nor the superior court ever explained how [the wife's] contributions to other parts of the marriage demonstrated that [the husband] intended to donate the condominium to the marital estate, and we see no obvious reason why this would be the case. This fact is therefore of little relevance to determining whether [the husband] possessed donative intent.[67 ]
Similarly, the fact that Sean contributed cash to the bank account that was used for paying the mortgage and other marital expenses is of little relevance to determining whether Cindy possessed donative intent. Further, Cindy's gross income of more than $ 2,000 biweekly was sufficient for her to meet the mortgage obligation of less than $ 900 each month.
Finally, Sean challenges the superior court's finding that he did not maintain or contribute to the house. He notes his testimony that "he installed a ban[n]ister, carpeted the stairs, installed vinyl in the kitchen and the bathroom, painted the bathroom, worked on creating an egress point for the basement, and redid the front wall and resinsulated it." But Cindy testified she paid Sean for his remodeling work, and the court credited this testimony.
In its order the superior court stated transmutation "occurs when a married couple demonstrates an intent to treat one spouse's separate property as marital property." This is incorrect. Transmutation "occurs when one spouse intends to donate separate property to the marital estate and engages in conduct demonstrating that intent."[68] At all times the relevant inquiry is whether the spouse who owned the property (Cindy) intended to donate it to the marital estate. Sean's intent when signing the refinancing document, giving Cindy cash, living in the house, and making improvements to the home is only relevant to the extent it illuminates Cindy's intent whether to donate the house to the marital estate.
The superior court issued its order before we clarified the law of transmutation by interspousal gift in Kessler . The court's analysis therefore contains the same errors we made in some of our past cases on the subject, which we corrected in Kessler .[69] We do not fault the court for these errors but wish to highlight the importance of accurately framing the transmutation analysis.
Despite its framing error, the superior court reached the correct result, largely through the correct analysis. We conclude that the court did not clearly err in finding the marital home was not transmuted. We affirm the superior court's finding that transmutation of Cindy's house did not occur.
D. Sean's Possessions
1. It was not clear error to find Cindy exercised reasonable care handling Sean's possessions.
Sean was arrested and then barred by a domestic violence protective order from returning to the marital home. He therefore could not easily retrieve his possessions from the home during the pendency of the divorce case, and he alleges Cindy damaged his possessions during this time. Sean obtained a writ of assistance to retrieve some of his possessions, and Cindy placed his items either in the front yard or in his van parked on the premises for him to retrieve. Sean argues Cindy damaged some of his property while packing and placing it in the van. Some items sat outside for months and, according to Sean, several were damaged; Sean argues Cindy should be responsible for this damage. Cindy responds Sean kept his possessions in a disheveled state before he left, she tried to be careful in packing and moving Sean's possessions, and Sean was responsible for his delay in retrieving his remaining items.
Both parties testified and introduced evidence to support their positions. Sean testified *752 to and showed video depicting the state of smaller possessions that Cindy packed and placed inside his van. According to Sean, the van was packed "chaotically." Cindy testified Sean kept his belongings in a disorganized state to begin with, a claim she supported with photographs of Sean's belongings before she packed them. Sean argues Cindy willfully damaged his model-boat collection. He testified that he stored the boats on a shelf and kept them in good condition, yet each item in the collection was damaged when he finally retrieved them. Cindy testified she did not break anything of Sean's and her fear of Sean would have prevented her from damaging his belongings intentionally.
Sean also testified to and showed video depicting the state of his van when he executed the writ of assistance and the damage to the van when his friend later retrieved it. There were dents and scratches on the van's body, including some consistent with damage from a board left resting on the vehicle. Sean acknowledged that some of the damage already existed and pointed out damage he alleged had been caused after his arrest. Cindy testified the only damage she caused to the van was accidentally pulling off the front license plate. She suggested that the rest of the damage already existed when Sean was arrested.
With respect to the items left in the front yard, Sean testified Cindy would not work with him to arrange for them to be retrieved. By contrast, Cindy testified she talked with Sean's lawyer repeatedly and asked that Sean retrieve his belongings.
The superior court found that "[s]ome of the damage to Sean's property occurred prior to Sean's departure from the house because the items were not stored proper[l]y," while "[s]ome of the damage occurred when the items were put into the van by Cindy and while they were stored and transported to Sean's residence." But it found that "Cindy acted reasonably and with due care when she stored the items on her property and when she packed them up for Sean to retrieve them" and, "[a]lthough some of the items may have been damaged after Sean left the residence, Cindy's conduct was not negligent or willful." It also found "that Sean could have taken steps to obtain his belongings earlier than he did and that Cindy did not want to keep Sean's belongings."
The superior court's findings, based in part on its observation of the parties as they testified, are due great deference.[70] Where the trial court makes factual findings that, as here, are supported by the record, we do not reweigh the conflicting evidence.[71] The court's findings were not clearly erroneous. We affirm the superior court's decision not to hold Cindy responsible for the damage to Sean's property and not to assign the value of these damaged items to Cindy.
2. The valuation of at least some of Sean's damaged items was clearly erroneous.
Sean argues the superior court over-valued certain items it awarded to him. At trial Sean testified many of his possessions had been ruined and were worthless because of Cindy's actions. Cindy did not contest that these items were ruined and instead argued she was not responsible for the damage. Thus, Sean argues, it was uncontested that certain items were worthless.
On his property spreadsheet at trial, Sean used the replacement value for these items and proposed they be awarded to Cindy to hold her responsible for allegedly damaging them. But he explained both in notes in the property spreadsheet and in his testimony at trial that the items were worthless. He requested that the property be found to have zero value if the court decided not to assign the replacement value of the property to Cindy.
The superior court assigned non-zero values for these items and awarded them to Sean. For example, Sean testified that a carpet roll appeared to have been "in the weather for quite a while," was "damp to the touch," and was "basically ruined." But the *753 court valued the carpet roll at $ 500. And two vinyl rolls left on their sides "out in the weather" were "ruined" due to moisture. The court valued the vinyl rolls at $ 100.
On appeal Sean argues it was clear error to assign non-zero values to his damaged possessions. Cindy responds that Sean's possessions, "damaged or not, ... have a value." We agree with Sean that in the face of undisputed testimony that certain items of his property were ruined, assigning any value to the ruined property was clearly erroneous. Alaska law directs trial courts to consider "the value of the [parties'] property at the time of division."[72] In Ogard v. Ogard we specified the valuation date should be "as close as practicable to the date of trial."[73] Limited exceptions to this approach include cases where one spouse is responsible for a change in the asset's value.[74] Absent such circumstances, the court should not assign any value to assets that no longer exist or have no value due to their damaged condition.
We vacate the superior court's valuation with respect to the damaged items Sean has identified and remand for the court to reconsider its valuation.[75]
E. The Children
1. It was not an abuse of discretion to award Cindy sole legal and primary physical custody.
The superior court must determine custody in accordance with the best interests of the children, guided by the factors listed in AS 25.24.150(c).[76] It has discretion in making this determination, and we will reverse only if "the record shows that [the] controlling findings of fact are clearly erroneous or the court abused its discretion."[77] "An abuse of discretion is found 'if the superior court's decision is clearly unreasonable under the totality of the circumstances' or 'if the superior court considered improper factors in making its custody determination, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others.' "[78] The superior court considered the statutory factors and awarded sole legal and primary physical custody to Cindy. The court's findings were not *754 clearly erroneous and its custody award was not an abuse of discretion.
Sean argues the superior court should have awarded him joint legal and shared physical custody of the children. He argues he successfully completed the LEAP batterers' intervention program, two comprehensive parenting classes, a substance abuse evaluation, and both individual and family counseling. He claims that there were no incidents of inappropriate behavior on his part after the parties separated. He cites his testimony that LEAP taught him how his actions and choices impacted others.
But at trial when Sean was asked about his history of domestic violence, he testified he had "been found guilty of kicking a door" and this was the only incident of domestic violence in his past. When asked if he understood that Cindy might have valid reasons for not wanting to communicate with him, he responded Cindy had "a right to believe whatever she want[ed]." Given this testimony, the superior court did not clearly err in finding that Sean had not internalized the lessons the LEAP program taught, did not acknowledge his wrongdoings, and was "unable to take responsibility for his actions in any meaningful way." It was not an abuse of discretion for the court to weigh these facts against Sean in its custody decision.
Sean argues the superior court should have followed the recommendations of custody investigator Bowman who "very strongly" recommended shared custody. But Bowman's report stated that the court "might consider shared physical custody." And Bowman had considerable reservations about Sean as a parent. Furthermore, "custody investigators are simply expert witnesses and ... their recommendations should be evaluated on a case-by-case basis, in the same manner as testimony presented by other witnesses."[79] "[C]ourts are free to reject those opinions provided that 'the evidence as a whole supports the court's decision.' "[80] The court did not abuse its discretion by not following this qualified recommendation of the custody investigator.
Finally, Sean argues the superior court "completely disregarded the drug tests [he] presented ... to show his sobriety." But there was significant testimony that suggested Sean was using drugs. And Bowman testified if Sean was not using drugs, that would be more concerning because drug use provided an explanation for his behavior. The court did not clearly err in finding Sean used methamphetamine during the marriage, and it did not abuse its discretion in considering this in its custody award.
The superior court appropriately considered the factors set out in AS 25.24.150(c) ; in light of evidence in the record, it did not abuse its discretion. We affirm the court's custody award.
2. The conditions set on Sean's unsupervised visitation were not an abuse of discretion.
The superior court permitted Sean unsupervised visitation, provided he satisfy multiple conditions. On appeal, Sean challenges two: undergoing a new substance abuse evaluation and monthly drug testing for six months. Regarding visitation decisions, we have said:
"[T]he best interests of the child standard normally requires unrestricted visitation with the noncustodial parent." We have held that where a court deviates from this norm by requiring supervised visitation, the decision "must be supported by findings that 'specify how unsupervised visitation will adversely affect the child's physical, emotional, mental, religious, and social well-being.' "[81 ]
*755 The superior court found "Sean's use of methamphetamine[ ] and alcohol ha[d] directly affected the boys' emotional or physical well-being" and "[w]hen the parties first separated, visitation between Sean and the boys would have been inappropriate and unsafe due to Sean's methamphetamine use and his erratic behavior." These findings are supported by the evidence, and given these findings, it was reasonable for the court to place conditions related to Sean's drug use on his unsupervised visitation with the children.
Sean argues the condition requiring him to undergo a new substance abuse evaluation was an abuse of discretion. Sean notes that his prior evaluation occurred one week outside the order's six-month time frame and there were significant delays in the trial. Sean argues the court's order was unnecessarily punitive and burdensome. But the relevant concern is the children's best interests. Given the negative impact of Sean's past drug use on the children, it was not an abuse of discretion for the court to require an updated assessment of Sean's status.
Sean also complains that the superior court's order after trial was unnecessarily punitive and burdensome because it required weekly hair follicle tests at his considerable expense. But on reconsideration the court reduced the test requirement to monthly testing. And the court only required testing for the limited time period of six months. Requiring monthly hair follicle testing for six months was justified by the same concerns discussed above and therefore was not an abuse of discretion.
We affirm the conditions the superior court placed on Sean's unsupervised visitation.
V. CONCLUSION
We VACATE the superior court's order with respect to Cindy's bank accounts and REMAND for a tracing analysis and additional findings. We AFFIRM the classification of Cindy's personal leave. We AFFIRM the court's finding that Cindy's house did not transmute into a marital asset. We AFFIRM the court's decision not to assess Cindy the value of Sean's damaged possessions, but we VACATE the court's valuation of these items and REMAND for reconsideration consistent with this opinion. We AFFIRM the court's award of sole legal and primary physical custody to Cindy and its conditions on Sean's unsupervised visitation.
Because we vacate and remand on issues relating to the first two steps of equitable distribution - classification and valuation of property - the superior court may need to reconsider its ruling on the third step - equitable allocation - as well. We do not retain jurisdiction.

Cindy testified her children from other fathers were adults at the time of trial, but their fathers had been in arrears on child support payments. Arrearage payments automatically deposited into the checking account, and Cindy spent the funds as needed on behalf of her adult children.

Cindy asserts in her brief that she had 483 hours available when the parties married, while Sean maintains that Cindy had only 475.57 hours at that time. We note that the superior court used 438 hours, which suggests a transposition error. The record supports the 483 number. As we explain, this dispute is irrelevant to the classification analysis. See infra note 56.

See AS 25.24.150(h) ("A parent has a history of perpetrating domestic violence ... if the court finds that, during one incident of domestic violence, the parent caused serious physical injury or the court finds that the parent has engaged in more than one incident of domestic violence.").

See AS 25.24.150(g) ("There is a rebuttable presumption that a parent who has a history of perpetrating domestic violence against the other parent, a child, or a domestic living partner may not be awarded sole legal custody, sole physical custody, joint legal custody, or joint physical custody of a child."); AS 25.24.150(h) ("The presumption may be overcome by a preponderance of the evidence that the perpetrating parent has successfully completed an intervention program for batterers, where reasonably available, that the parent does not engage in substance abuse, and that the best interests of the child require that parent's participation as a custodial parent because the other parent is absent, suffers from a diagnosed mental illness that affects parenting abilities, or engages in substance abuse that affects parenting abilities, or because of other circumstances that affect the best interests of the child.").

Beals v. Beals , 303 P.3d 453, 458 (Alaska 2013).

Id . at 459 (quoting Odom v. Odom , 141 P.3d 324, 330 (Alaska 2006) ).

Hockema v. Hockema , 403 P.3d 1080, 1088 (Alaska 2017) (quoting Urban v. Urban , 314 P.3d 513, 515 (Alaska 2013) ).

Beals , 303 P.3d at 459.

Hockema , 403 P.3d at 1088.

Grove v. Grove , 400 P.3d 109, 112 (Alaska 2017) (quoting Hansen v. Hansen , 119 P.3d 1005, 1009 (Alaska 2005) ).

Schaeffer-Mathis v. Mathis , 407 P.3d 485, 490 (Alaska 2017).

Id . at 490-91 (alteration in original) (quoting Borchgrevink v. Borchgrevink , 941 P.2d 132, 134 (Alaska 1997) ).

Id . at 491 (first quoting Meier v. Cloud , 34 P.3d 1274, 1277 (Alaska 2001) ; then quoting Borchgrevink , 941 P.2d at 134 ).

Schmitz v. Schmitz , 88 P.3d 1116, 1127 (Alaska 2004) (quoting 1 Brett R. Turner, Equitable Distribution of Property § 5:23 at 263 (2d ed. 1994) [hereinafter 1 Turner (1994) ] ).

Id .

Id. (quoting 1 Turner (1994), supra , § 5:23 at 263). "Property which is owned by third parties was not acquired by the parties, and thus is not subject to division." 1 Brett R. Turner, Equitable Distribution of Property § 5:14 at 298 (3d ed. Nov. 2017 update) [hereinafter 1 Turner (2017) ]. This includes the property of children of the parties. See Beal v. Beal , 88 P.3d 104, 119 (Alaska 2004). For simplicity, this tracing discussion refers only to marital and separate property.

Schmitz , 88 P.3d at 1127.

Id. at 1128.

Id . (quoting 1 Turner (1994), supra , § 5:23 at 264).

See id. (citing Carlson v. Carlson , 722 P.2d 222, 224 (Alaska 1986) ; 1 Turner (1994), supra note 14, § 5:23 at 266 n.591).

Id . (quoting 1 Turner (1994), supra note 14, § 5:23 at 266).

Id .

Id .

Id. at 1128-29.

Id. at 1128.

Id.

See 1 Turner (2017), supra note 16, § 5:62 at 623.

Id. at 628.

Id. at 629.

Id.

Id.

Id.

Id. at 631.

Id.

Id. at 629 (emphasis in original).

Day v. A & G Constr. Co. , 528 P.2d 440, 444 (Alaska 1974).

See id. at 444-45.

See 1 Turner (2017), supra note 16, § 5:62 at 629.

Id .

See Bilbao v. Bilbao , 205 P.3d 311, 313-15 (Alaska 2009) ; 1 Turner (2017), supra note 16, §§ 5:59, 5:62-63.

See 1 Turner (2017), supra note 16, § 5:63 at 639-43. The court may also consider factors such as the credibility of the testimony, whether it is controverted by other evidence, and whether it is corroborated by admissions by the opposing party; the degree of documentation available and which party would control any such records; and other circumstances surrounding the transaction, including its remoteness in time. See id .

Id. § 5:59 at 610 (quoting Chenault v. Chenault , 799 S.W.2d 575, 578 (Ky. 1990) ).

See id. § 5:63 at 638.

Bird v. Starkey , 914 P.2d 1246, 1249 (Alaska 1996).

Id. (second and third alterations in original) (quoting Waggoner v. Foster , 904 P.2d 1234, 1235 (Alaska 1995) ).

Id.

Horne v. Touhakis , 356 P.3d 280, 282 (Alaska 2015) (quoting Hooper v. Hooper , 188 P.3d 681, 685 (Alaska 2008) ).

It is possible the superior court took Cindy's testimony that $ 12,000 total belonged to Robert and mistakenly subtracted all of this from the $ 15,559.33 checking account balance, producing a difference of $ 3,559.33 that the court found to be marital property. This was also the exact amount Cindy had proposed as the marital property component of the checking account. But this does not account for or explain the court's decision to treat $ 11,000 in the $ 22,652.60 savings account as non-marital, and it ignores Cindy's testimony that $ 10,000 of Robert's funds were held in the savings account.

Schmitz v. Schmitz , 88 P.3d 1116, 1127 (Alaska 2004) ("Assets acquired during marriage 'as compensation for marital services' - most commonly salaries earned by either spouse during marriage - are considered primary marital assets." (quoting 1 Turner (1994), supra note 14, § 5:23 at 623)); Lewis v. Lewis , 785 P.2d 550, 558 (Alaska 1990) ("[A ]ll property acquired during the marriage is available for distribution, excepting only inherited property and property acquired with separate property which is kept as separate property." (emphasis in original)).

On the record before us, we are not prepared to say that the superior court's finding that $ 12,000 in Cindy's bank accounts belonged to Robert was clearly erroneous. But to the extent the court decides to evaluate additional evidence on remand, it is free to reconsider this finding.

692 P.2d 267, 268 (1984) (quoting Suastez v. Plastic Dress-Up Co. , 31 Cal.3d 774, 183 Cal.Rptr. 846, 647 P.2d 122, 125 (1982) ).

In Martin v. Martin we treated Alaska Airlines "frequent flyer" miles as marital property. 52 P.3d 724, 731 (Alaska 2002). The husband argued that the parties could not actually sell the mileage, but we explained that "market transferability is not a prerequisite to determining value for property division purposes. Fair market value is defined as the price a willing buyer would pay to purchase the asset on the open market from a willing seller." Id.

See Schober , 692 P.2d at 268.

See 1 Turner (2017), supra note 16, § 5:62 at 634 n.21.

Kessler v. Kessler , 411 P.3d 616, 618 (Alaska 2018) (first quoting Nicholson v. Wolfe , 974 P.2d 417, 423 (Alaska 1999) ; and then quoting AS 25.24.160(a)(4) ).

Simply classifying the lowest balance of the leave "account" during marriage as separate property yields the same result as the last-in, first-out rule which Cindy argues, and we agree, should apply. That rule has been adopted by at least one court, see Abdnour v. Abdnour , 19 So. 3d 357, 359-60 (Fla. Dist. App. 2009), and has been approved by the treatise Equitable Distribution of Property for the reasons outlined in this opinion. See 1 Turner (2017), supra note 16, § 5:62 at 634-35 n.21.
Sean's proposed first-in, first-out rule goes too far toward favoring the marital estate "at the expense of content-neutral rules for untangling mixtures of marital and separate property." Id. at 635. Sean's argument that State of Alaska employees use leave on a first-in, first-out basis under 2 Alaska Administrative Code 08.045(d) does not persuade us otherwise; this regulation was not adopted for the purpose of untangling commingled property.

411 P.3d at 616.

Id. at 619.

Id. at 619-20 (quoting Cox v. Cox , 882 P.2d 909, 916 (Alaska 1994) ).

Id. (emphasis in original) (quoting Cox , 882 P.2d at 916 ). The factors are " '(1) the use of property as the parties' personal residence, ... (2) the ongoing maintenance and managing of the property by both parties,' ... (3) placing the title of the property in joint ownership[,] and (4) using the credit of the non-titled owner to improve the property." Id . at 620 (quoting Cox , 882 P.2d at 916 ) (all alterations but last in original).

Id.

1 Turner (2017), supra note 16, § 5:69 at 665; see also Kessler , 411 P.3d at 621.

Kessler , 411 P.3d at 621.

See Sparks v. Sparks , 233 P.3d 1091, 1096 (Alaska 2010), overruled on other grounds by Engstrom v. Engstrom , 350 P.3d 766, 771 (Alaska 2015) (alterations in original) (quoting 1 Brett R. Turner, Equitable Division of Property § 5:69 (3d ed. 2005)) ("In evaluating and determining the intent of the alleged donor, '[t]he best proof of intent to transmute is ... an express statement by the owning spouse that he intended to give the other spouse an interest in the property.' ").

Kessler , 411 P.3d at 622 (quoting Odom v. Odom , 141 P.3d 324, 333 (Alaska 2006) ).

Id.

Id . at 621.

Id. at 619.

See id. at 618-20.

See Olivera v. Rude-Olivera , 411 P.3d 587, 593 (Alaska 2018).

See Kylie L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs. , 407 P.3d 442, 450-51 (Alaska 2017).

AS 25.24.160(a)(4)(I).

808 P.2d 815, 819 (Alaska 1991).

See, e.g. , Sandberg v. Sandberg , 322 P.3d 879, 890 (Alaska 2014) ; Beals v. Beals , 303 P.3d 453, 461-62 (Alaska 2013) ; Ogard , 808 P.2d at 820.

On remand, the court should determine and make findings whether any items were ruined or damaged and, if neither party was at fault in causing the damage, assign an appropriate value for each item consistent with this opinion.

AS 25.24.150(c) provides:
The court shall determine custody in accordance with the best interests of the child under AS 25.20.060 -25.20.130. In determining the best interests of the child the court shall consider
(1) the physical, emotional, mental, religious, and social needs of the child;
(2) the capability and desire of each parent to meet these needs;
(3) the child's preference if the child is of sufficient age and capacity to form a preference;
(4) the love and affection existing between the child and each parent;
(5) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;
(6) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child, except that the court may not consider this willingness and ability if one parent shows that the other parent has sexually assaulted or engaged in domestic violence against the parent or a child, and that a continuing relationship with the other parent will endanger the health or safety of either the parent or the child;
(7) any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents;
(8) evidence that substance abuse by either parent or other members of the household directly affects the emotional or physical well-being of the child;
(9) other factors that the court considers pertinent.

Schaeffer-Mathis v. Mathis , 407 P.3d 485, 490-91 (Alaska 2017) (alteration in original) (quoting Borchgrevink v. Borchgrevink , 941 P.2d 132, 134 (Alaska 1997) ).

Id. at 491 (footnote omitted) (first quoting Meier v. Cloud , 34 P.3d 1274, 1277 (Alaska 2001) ; then quoting Borchgrevink , 941 P.2d at 134 ).

Matthew P. v. Gail S. , 354 P.3d 1044, 1049 (Alaska 2015) (quoting Ebertz v. Ebertz , 113 P.3d 643, 647 (Alaska 2005) ).

Id. (quoting Chesser v. Chesser-Witmer , 178 P.3d 1154, 1159 (Alaska 2008) ).

Yelena R. v. George R. , 326 P.3d 989, 1002 (Alaska 2014) (alteration in original) (first quoting J.F.E. v. J.A.S. , 930 P.2d 409, 413 (Alaska 1996) ; then quoting Fardig v. Fardig , 56 P.3d 9, 14 (Alaska 2002) ). We have used the same standard when (as here) reviewing conditions on a parent's exercise of unsupervised visitation. See, e.g. , Sagers v. Sackinger , 318 P.3d 860, 866-67 (Alaska 2014) (affirming trial court's requirement that father undergo a psychological evaluation before having unsupervised visitation); Curgus v. Curgus , 514 P.2d 647, 649 (Alaska 1973) ("The trial court is given broad discretion in fashioning suitable visitation rights and support obligations.").